UNION PACIFIC RAILWAY CO. v. JOHN W. MILLIKEN.

1. NEGLIGENCE OF CORPORATION; *Action for Damages by Employee.* Where one receives injury through the incompetency of a fellow servant, the employer is not liable unless he employed such incompetent servant without reasonable inquiry as to his qualifications, or continued him in service after knowledge of his incompetency. [Following *Dow v. Kansas Pacific Rly. Co.*, ante, p. 642.]

2. INSTRUCTIONS—*When Contradictory—Effect of.* Where two contradictory instructions are given, a new trial will ordinarily be granted, unless it plainly appears that the jury have not been mislead thereby.

3. ISSUE; *Total failure of Proof.* Where there is a total failure of testimony upon a point essential to the plaintiff's recovery, a verdict in his favor will be set aside.

4. DAMAGES; *Measure of Compensation; Excessive Verdict.* In an action for injuries to the person where the sole permanent disability is the loss of a hand, and where there was neither lengthened sickness nor extraordinary suffering, a verdict for ten thousand dollars is excessive.

*Error from Leavenworth District Court.*

MILLIKEN brought his action to recover damages for the loss of his right hand. He was in the employ of the *Railway Company* as watchman and yardman at Ellsworth, and a part of his duty was to assist in making up trains at that point. While engaged in coupling cars, and in the line of his duty, in March 1868, a train moved violently, and without any warning against one of the two cars plaintiff was about coupling together. His hand was caught between the draw-heads of the cars, and so crushed that amputation was necessary, and shortly after it was amputated at the wrist. One Allison was the engineer upon and in control of the locomotive by which the train causing the injury was moved; and plaintiff alleged " that said Allison was utterly incompetent and unfit to act as such engineer, or to have charge or control of said locomotive, which the said defendant then well knew, and the said defendant had before then employed the said Allison to act as such engineer, and had put him in charge of said locomotive without reasonable grounds to believe he was competent for such service, and without having exercised reasonable diligence to ascertain his fitness to act in that capacity." Answer, general denial. The case was tried at the May Term 1869. Verdict and judgment in favor of the plaintiff for $10,000. The *Railway Company* brings the case here on error. So much of the facts, the evidence, and the instructions as are material are stated in the opinion. (No briefs have come to the hands of the reporter.)

*Hurd & Stillings,* and *Usher & Dennis,* for plaintiff in error.

*Clough & Wheat,* and *T. P. Fenlon,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action for injuries sustained by defendant in error while in the employ of the plaintiff in error, through the alleged negligence of a co-employee. At

the time of the injury defendant in error was engaged in coupling cars, and while thus engaged his hand was caught between the bumpers and crushed so that amputation became necessary. He claimed that the injury was caused by the negligence of the engineer in backing without a signal. In the course of his charge to the jury the learned judge before whom this case was tried, thus instructed them—"and the defendant undertook that its engineers should be reasonably fit and competent for their positions." That is to say, such was the obligation the company assumed when it made the contract of employment; a failure to employ such engineers would be a breach of such contract: proving incompetency of the engineer would 1. Corporation; prove breach of the contract; if the contract was negligence; action for broken by the company, and injury resulted theredamages by employee. from, the injured party would be entitled to damages therefor. Such would be the legitimate inference from this instruction; such would be the probable reasoning in the minds of the jury. This instruction does not embody a correct statement of the law. The contract is not that the engineers shall be competent, but that the company will make reasonable efforts to secure competent engineers. The company does not bind itself absolutely to have such engineers, but that it will use all ordinary care and diligence to obtain them. The contract of employment is not broken by a failure to have but only by a failure to use reasonable efforts to obtain them. The company does not guarantee to one employee competency of all the others. In *Tarrant v. Webb*, 18 C. B., 797, (37 Eng. L. and Eq., 281,) Creswell, J., says: "In a case of this kind the negligence which causes the wrong is that of the servant; and not that of the master; and the question thus arises whether there was any negligence in the master in not employing competent servants." And in the same case Jervis, C. J., uses this language: "Negligence may consist of more than one matter. But it cannot exist if the master does his best to employ competent persons. He cannot warrant the competency of his servants." This rule is well settled by authority both in England and this country: *Elizabeth Clark*,

41—8TH KAS.

*or Reid, v. The Bartonshill Coal Co.*, 3 McQueen, 206, cited in Hay's Digest, p. 221; *Frazier v. Penn. Rly. Co.*, 38 Penn. St., 104; *Farwell v. Borton & Morse. R. R. Corp.*, 4 Met., 49; *C. & I. C. R. R. Co. v. Arnold*, 31 Ind., 182; 5 Ohio St., 560; 18 Wis., 700; 1 Redfield on Rlys., 531, and cases there cited; *Dow v. Kansas Pacific Rly., Co.*, decided the present term, (ante, p. 642.)

But in another part of his charge to the jury the court below laid down the rule correctly, as follows:

"If the evidence shows that Allison and the plaintiff were both in the service of the defendant, and both engaged in the common service of making up a train of cars for the company, although the particular duties of Allison pertained to the managing of the motive power of the train, and the plaintiff's to the coupling the cars, the defendant is not liable for an injury resulting from the negligence of Allison, unless it appears that Allison was not reasonably careful or skillful as an engineer, and that the company was aware of his unfitness or did not use reasonable diligence in employing him in that capacity."

Is not the error in the one instruction corrected by the giving of this other? The whole charge must be taken together, and oftentimes an incorrect statement of the law in one portion is so far explained, limited, or qualified by some other, that it is evident the jury cannot have been misled. But where error of law occurs in the charge it should be perfectly plain that the jury have not been misled, or a new trial will be granted. There is nothing in the words used which would lead the jury to understand that one instruction is used in limitation or qualification of the other. If the jury perceived the contradiction there was nothing by which they could determine in which the court erred, or which should receive the most consideration. Indeed, the verdict they rendered, as will appear from the next point considered, shows that they followed the erroneous instruction rather than the other. Upon this point we quote the clear language of Judge Thompson upon a kindred question in the case of the *Cattawissa R. R. Co. v. Armstrong*, 49 Penn. St., 192: "There was error in this, unless we can see clearly that it was neutralized

2. Contradictory instructions; effect of.

by what preceded it. How is it possible to ascertain this?
Can we suppose it made no impression? The jury heard it;
it had meaning, and was given to guide them to what princi-
ples they were bound to apply the facts, and it was almost the
last words that fell on their ears in closing this part of the
instructions. It will not do to hope or conjecture that a false
rule will do no evil, because a true one also was given. To a
court it would have been harmless; but how was a jury to say
which was right and which was wrong?" See also *Horne v.
The State*, 1 Kas., 73.

Defendant in error claimed that the injury was caused by
the negligence of a co-employee of the company. This co-
employee did not occupy a higher grade of employment, but
was subject to his orders, and disregarding them wrought the
injury. It was alleged in the petition that this fellow-servant
was utterly incompetent and unfit for his work, that of engi-
neer; that the company was aware of this fact, and that it had
3. Care and employed him "without reasonable grounds to
skill. Proof
of negli-     believe he was competent for such service, and
gence. Fail-
ure of proof. without having exercised reasonable diligence to
ascertain his fitness to act in that capacity." Two facts are
alleged, each essential to recovery: first, incompetency of the
engineer, and second, a continuance in employment by the
company with knowledge of his unfitness; or, what is equiva-
lent to this in fixing the liability, an employment without
reasonable inquiry into his fitness. In regard to the first, the
evidence of incompetency was the transaction itself which
caused the injury, the testimony of Nelson that Allison the
engineer was not a regular engineer, and the testimony of
Granger as to what a competent and skillful engineer would
and would not do. This testimony, though it may not carry
the clearest conviction of the incompetency of Allison, is yet
evidence from which a jury might legitimately find it. Yet
it does not disclose such gross and patent incompetency as
would justify the inference that his employer must have
known it. We can conceive of cases where the proof of incom-
petency might be so overwhelming, and extending over such a

length of time, that it could reasonably be inferred no employer could be ignorant of its existence. But this is no such case. There may be proof enough to sustain a finding of incompetency, but nothing which could be held to impart notice. Turning now to the second point noticed, that is, continuance of employment with knowledge of unfitness, or employment without reasonable inquiry as to fitness, we are constrained to say after careful examination of the record, that there is no testimony tending to establish either, sufficient to support a finding. Either one of these is sufficient. One is equivalent to the other. One or the other must be shown, or the company is not liable. The rule to be followed where there is a total failure of evidence on any point essential to a recovery was laid down in the case of *Backus v. Clark,* 1 Kas., 303. It was there held that such a failure presented a simple question of law, and necessitated the setting aside of a verdict in the plaintiff's favor. Applying that rule to this case and we are compelled on this ground to reverse the judgment and order a new trial. It must be remembered that these are independent, substantial facts, facts which must be proved as much as the fact of injury. And the burden of proof on these points as well as the others was with the defendant in error. It is not sufficient to show such a combination of circumstances as renders it possible that one of these alleged facts existed, any more than it would be sufficient to show such a combination of circumstances as rendered it possible that the defendant in error was injured. The question is not what might have been, but what was. The place of the accident was Ellsworth. Allison, the engineer, had been there but a few days. The only direct testimony as to who employed him, and how he came to be at Ellsworth, is that furnished by Granger, a witness for plaintiff in error, and its yard-master and despatcher of trains at that place. This was his testimony on that point:

" Q.–Did you know this Jack Allison? A.–Yes, sir. Q.–Do you know how he came there? A.–Mr. Boon, the master mechanic at Wyandotte, sent him there. Q.–Upon what occasion? A.–Mr. Walsh sent for a man, and Allison was sent up with a

letter to Walsh, and he set him to work on the west end of the road. He gave him a letter of introduction. (Plaintiff moved to strike out all the witness said about a letter, which motion was by the court sustained.) Q.–Was there any engineer wanted up there? A.–I think so. Q.–You think he came up at the instance of Mr. Boon? A.–Yes, sir. Q.–Who was Mr. Boon? A.–Master mechanic of the whole road. Q.–Do you know his reputation as to skill? A.–I know his reputation is good. I don't know him personally."

Now so far as this testimony goes it points to care and diligence. True, it does not amount to very much, being mainly important as indicating the line of inquiry. But whatever of bearing it has is on the side of the plaintiff in error. It tends to show that the employment was made by one qualified, one of the chief officers of the road, and one especially charged with the supervision of that kind of service. What knowledge, what information this master-mechanic had, what inquiries he made as to Allison's competency are undisclosed. We have no right to infer in the absence of testimony that he employed without knowledge or inquiry. We are never justified in imputing negligence or wrong-doing to one without proof. But it may be said the jury were under no obligation to accept the testimony of one of the company's witnesses and employees—that they might have seen enough in the manner of his testifying to satisfy them of his untruthfulness. Suppose it was evident that he was falsifying, and the jury therefore rightfully rejected all his testimony, what is there then in the record to indicate when, how, or by whom Allison was employed? The defendant in error on his direct examination testified as follows:

" Q.–How long had you known Jack Allison who was in charge of the engine? A.–I saw him about four days before the day I was injured. I never knew he was an engineer till that day. Q.–What had he been doing? A.–Loafing around the depot, and around there. Q.–Had he been doing anything for the company? A.–Nothing that I ever saw, except to go out one night to fire. Q.–Do you know how that man Allison came to be acting as engineer on that day? A.–I do not. Q.–Had you ever seen Jack Allison acting as engineer before

that day? A.–No, sir.   Q.–Do you know whether he had acted
on the road as engineer before? A.–Not to my knowledge.
Q.–Do you know how he came to be acting as engineer on
that day? A.–I don't know; I had no charge of the engineers.
Q.–Who had? A.–George Walsh.·  Q.–Who was he? A.–What
is called a master mechanic.   Q.–Where was he that day? A.–I
suppose at his office.   Q.–Where was that? A.–At the Round
House, above Ellsworth.   Q.–What had Allison been doing, to
your knowledge, before that day? A.–Nothing.   Only one time
I saw him on an engine firing, going to Hays.   Q.–Do you
know what he did after that date? A.–No, sir."

His cross-examination upon this, though a little longer, elic-
ited no new fact.   Now in this testimony the witness plainly
denies any knowledge in regard to the point we are consider-
ing.   He does not know how Allison came to be employed, by
whom he was employed, what information such employer had,
or what inquiries he made concerning Allison's qualifications.
It would seem from this testimony to have been the opinion
of the witness that George Walsh, the master mechanic at the
station, was the party chargeable with the employment of
Allison; yet this is merely an inference as to his opinion, and
not his testimony as to a fact.   Now the testimony of these
two witnesses is all that bears upon the circumstances of
Allison's employment.   The one witness denies knowledge; the
other's testimony points to diligence.   What then can support
a finding of negligence?   Nor does the case stand any better
in reference to the allegation of a continuance of the employ-
ment after knowledge of Allison's unfitness.   The plaintiff
testified that Allison had been at Ellsworth only three or four
days before the injury—that he had run an engine only once or
twice during that time.   No one of the officers of the road is
shown to have been present while he was so engaged.   True,
the witness Nelson, in answer to this question, "What officers
of said defendant passed through and stopped at that yard at
Ellsworth during the time said Jack Allison was in the employ
of said railroad company, or while you were there," testified—
"The superintendent, road-master, and supervisor of said road.
The superintendent was there very often, and road-master there
very often also."   But as Allison was in the employ of the

company for a time subsequent to the injury, this may have reference entirely to such subsequent time. Assume that it did not, but referred partly to the time prior to the accident, and still it is far from bringing home knowledge of Allison's incompetency to the officers of the company. It is possible that Allison's incompetency was manifested before the time of the accident. It is possible that some one of the officers of the company was present and noticed it. But upon which trip, and which officer, are questions which find no answer in the testimony. The time of service was too short to raise any presumption of knowledge of his incompetency. It must be shown that some officer having responsibility for his continuance in service was aware of his unfitness for it. Upon this the record is absolutely silent.

The injury in this case was the loss of a hand. The damages assessed were ten thousand dollars. No fixed rule can be laid down for estimating the damages to be awarded for physical injuries. Great latitude is of necessity allowed to a jury, and within certain limits their assessment, whether inadequate or excessive, cannot be disturbed. Still, the action of the jury is not altogether beyond control. There are some

4. Damages, measure of; compensation.

rules and principles to guide in the assessment, a disregard of which will avoid the verdict. Outside of those cases in which the question of exemplary or punitive damages is involved, the basis of the assessment is compensation. No verdict is right which more than compensates; none which fails to compensate. But how shall it be ascertained what is compensation? One method of determining it, which we often hear when appeals are made to a jury for large damages, is this: "What would you take and suffer the same pain and loss?" In other words, the price at which one would voluntarily undergo physical pain and suffering and loss of limb, is claimed to be a fair test of the compensation which should be awarded to another who has thus suffered. Or, more shortly, the sum you would have to give to buy is the sum you should pay. This is radically, intrinsically wrong. It seeks to parallel such injuries with

injuries to property, and in making the parallel ignores the test of values. Not what you can buy an article for, but what you can sell it for is the test of its market value. Here there can be no sale; for we can find no purchaser. Every one realizes that it is true, as said, that "life and wealth are not commensurate, much less convertible values." Every one feels that no man of good judgment would voluntarily exchange his limbs for any sum. Whatever may be their pecuniary value to him in the matter of obtaining a livelihood, they are so necessary to the comfort and pleasure of living that he would not assent to give them up upon any conditions. And no man would purchase that which would be of no value to him when obtained, but a great and irreparable loss to the seller. Again, a corporation doing an injury should not be mulcted in any greater sum than an individual doing like injury. The former has the same rights, and is subject to the same obligations in this respect, as the latter. Yet no one can be blind to the fact that jurors too often ignore this rule. Suits for damages against corporations average larger verdicts than like suits against individuals. Because the party paying is an impersonal, intangible existence, a soulless organization, destitute of feeling, it does not seem so harsh to mulct it in heavy damages. More than that, the relations of a corporation to the public frequently develop an irritation and dislike which unconsciously finds expression in enormous verdicts. That this feeling arises from the conduct of the agents and officers of the corporation may be conceded; yet it furnishes no justification for increasing an award above the compensation the injury demands— for not the agents and officers, but the stockholders, suffer the loss. In fixing the amount which may be recovered by the personal representatives, in case of death from the injury, the legislature furnished some guide for determining the sum to be awarded when death does not ensue. The largest sum which can be recovered in case of death is ten thousand dollars—just the amount of this verdict. In other words, the jury have given to this plaintiff as much for the loss of his hand as they could have given to his representatives and those dependent on

him if he had been killed. We do not wish to be understood as holding that in no case of physical injury, where the party survives, may a verdict properly exceed the amount which could be awarded in case of death. There may be cases where the injury is so overwhelming, so prostrating, that the party not only ceases to be of any assistance to his family, but becomes a burden upon them; or cases where the party is confined to his bed for a great length of time, and put to large expenses for surgical skill and nursing, with the certainty of being permanently disabled from any employment, which may justify verdicts in excess of ten thousand dollars. But in a case like the one before us, where the sole permanent injury was the loss of a hand, which was amputated just above the wrist, without any protracted sickness or lengthened confinement, an award of ten thousand dollars shocks the sense of right. Is his hand worth as much as his life? Again, some light may be thrown by comparing the wages a party could earn before and after the injury. If he could earn fifty dollars a month before, and twenty-five after, the award for a sum whose interest was fifty dollars per month would seem to make the injury a pecuniary blessing. The defendant in error was earning pior to the injury sixty-seven dollars a month, or about eight hundred dollars a year. The sum awarded, at the ordinary rate of interest in Kansas, would give him twelve hundred dollars a year. An award of an annuity of twelve hundred dollars for the loss of a hand, to one who prior to the loss was earning but eight hundred, certainly presents a case where the verdict more than compensates. It is not the purpose of the law to encourage idleness, to take away the necessity for, or incentive to toil. The obligation to labor should remain as strong after as before the injury. It is compensation when the diminished value of such labor is made good. Still again, the annuities granted by the government by way of pension to those who suffer injuries in its service furnish some criterion. He who loses a limb in defense of his country has as much claim upon that country for compensation as one man can have upon another for injuries received through the latter's negligence. Of course, these

pensions cannot be so graded as to meet the necessities of every individual case. They respond only to the average. But such response is the judgment of the most thoughtful minds, based upon the most complete information. It averages values in different parts of the nation as well as classes of injuries, so that it is not an absolute guide in any given locality. But being an average it helps to determine what is compensation. The elements which lift any given case above or reduce it below such average can generally be ascertained without difficulty. At least an average furnishes a starting point. In whatever light we look upon this verdict it seems to us to be largely in excess of a fair compensation for the injury. The judgment of the court below will be reversed, and the case remanded for further proceedings.

VALENTINE, J., concurring.