No. 42,320

MARY FRANCES NEELY, *Appellee,* v. ST. FRANCIS HOSPITAL AND SCHOOL OF NURSING, INC., a Corporation, *Appellant.*

(363 P. 2d 438)

Opinion filed July 8, 1961.

*William Tinker,* of Wichita, argued the cause, and *J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel, Jr., John W. Brimer, Harry L. Hobson, Jr., Getto McDonald, Arthur W. Skaer, Hugh P. Quinn, William Porter, Alvin D. Herrington, Darrell D. Kellogg,* and *Richard T. Foster,* all of Wichita, were with him on the briefs for the appellant.

*Gerald L. Michaud,* of Wichita, argued the cause, and *Russell Cranmer,* of Wichita, was with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This is an appeal in a damage action for personal injuries, proximately caused by negligent treatment of plaintiff by defendant hospital, from the trial court's judgment in favor of plaintiff based upon answers to special questions and the verdict of the jury and all other rulings, orders and decisions thereon including: Overruling of the hospital's motion for judgment notwithstanding the verdict, and its motions to set aside answers to special questions, and to grant a new trial as well as the overruling of the hospital's demurrer to plaintiff's evidence and the overruling of a renewal of such demurrer along with a motion for directed verdict.

On April 1, 1956, plaintiff, a woman thirty-seven years of age with a life expectancy of 31.75 years, was employed by Midwestern Industries in Wichita as a PBX operator at a salary of $75.00 a week. About 11:00 o'clock p. m. while she was working on a pair of sunglasses, the lens broke and she sustained a cut about one half inch long on the middle finger of her left hand.

At 8:00 o'clock a. m. on April 2, 1956, plaintiff arrived at work, went to the company nurse to get a bandaid and the nurse sent her

to defendant hospital. Mrs. Davis, a fellow employee of plaintiff, went with plaintiff to the hospital and they arrived at the emergency room thereof about 8:30 a.m. where nurse Oleta Melton, intern William Bibb, and a Sister of the Order managing the hospital, examined plaintiff's finger, cleansed the wound and sutured the finger. It was decided that plaintiff should have, and she was given, a penicillin shot followed by a skin or sensitivity test in the upper right arm, to determine plaintiff's susceptibility or reaction to horse serum which was the most common base used in administering a shot of tetanus antitoxin. In the skin test a minute quantity of the serum was injected between the layers of plaintiff's skin and subsequently she received 1500 units of tetanus antitoxin by hypodermic injection in her upper right arm. The penicillin shot and serum sensitivity test were administered by the nurse but the tetanus antitoxin was gixen by the intern who told plaintiff to call her doctor as soon as she returned to work. Plaintiff and Mrs. Davis left the hospital and by the time they reached their car the area of the sensitivity test on plaintiff's upper right arm was showing a positive reaction. A stop was made for coffee and the spot on her arm was becoming red and puffy and had increased in size from a nickel to that of a half dollar. Plaintiff returned to work, her arm developed a reddening of the skin, a swelling, and a rash broke out over her body. She continued to be ill and feverish, and her muscles ached.

On April 14, 1956, a roaring began in plaintiff's ears and on April 15 she returned to the hospital where she remained through April 23, 1956. In September, 1956, after receiving directions so to do from medical sources, plaintiff went to the Mayo Clinic at Rochester, Minnesota, where diagnosis showed 50 to 55 percent permanent loss of hearing in both ears.

In October, 1959, plaintiff was employed at $40.00 a week by a toy factory in Ruleville, Mississippi. Her income was entirely dependent upon her own efforts. Prior to the injury plaintiff had been in good health, had had a vivacious personality, and the ability to meet people, which made her a capable secretary, receptionist and PBX operator. After the injury she was highly nervous and had a noticeable change of personality.

The testimony of witnesses was highly conflicting, much of it was technical medical testimony, and only the principal parts will be touched upon. The prescribed minimum standard of waiting time

between a skin test and giving of a tetanus shot is fifteen to twenty minutes. However, there is no specification as to where the test is to be made on the body for any reaction to show in that period of time. Doctor Ernest R. Schlachter testified that throughout the country he knew the universal practice was to wait not less than ten minutes and that when he was giving a tetanus shot to a person for the first time, which he stated was the usual reason for giving the skin test, he waited fifteen minutes but if the shot was given in the upper arm "one should probably wait a minimum of thirty minutes." He further testified a positive skin test was a warning and should put one on guard that a reaction of one or the other types, meaning immediate or delayed, might possibly occur. Doctor Schlachter stated that in his opinion the hospital, in allowing the medical procedures followed by the intern and nurse in question, had not met the approved standards of medical practice in the community in the treatment of plaintiff.

The other expert medical testimony was contradictory and controversial on the proposition as to whether the skin test rendered any assistance at all in predicting the delayed reactions terminating with serum sickness that could settle in some nerve tissue similar to that which happened to plaintiff, and the immediate reaction which would be a serum sickness made evident by swelling, breaking out with hives, difficulty in swallowing, redness of the skin, etc., and finally, whether such skin test if negative would be an assurance there would be no reaction. As usual, plaintiff here can point to certain portions of the expert medical testimony in favor of her contentions, and the hospital can point to portions of the expert testimony which appear to be in support of its contentions. These matters will be referred to again later.

In regard to the time element, plaintiff and the woman who took her to the hospital both testified that no more than five minutes could have elapsed between the time the skin test was administered by the nurse and the time the intern injected the 1500 units of tetanus antitoxin into plaintiff's upper arm. According to their version of what took place, plaintiff and her companion arrived at the emergency room of the hospital, the cut was examined and thoroughly cleaned by the intern and nurse on duty, and while a Sister was present, it appears she only came and went and took no active part. The intern sutured the finger with ten stitches and plaintiff was given a shot of penicillin. Then it was determined

that plaintiff should have a shot of tetanus antitoxin and since plaintiff had not previously had one, the nurse gave her a skin test and left the room. Immediately the intern came in and gave plaintiff 1500 units of tetanus antitoxin and, as previously mentioned, no more than five minutes could have elapsed between the two shots. Plaintiff and her companion thereafter went to their car and in about eight to ten minutes severe positive reactions were showing around the area of the skin test.

On the other hand, the intern and nurse testified the hospital records showed that the skin test was made in the forearm at 9:10 a. m. and the 1500 units of tetanus antitoxin were injected into the upper arm at 9:45 a. m. As to other matters such as the penicillin shot and the suture referred to in the testimony of the nurse and intern, the exact sequence of these events is somewhat difficult to tell from the record before us.

At the conclusion of all the evidence, the trial court instructed the jury. Failure to instruct the jury on defendant's requested instructions No. 8 and No. 13, along with a contention that the instructions given were misleading, as well as the trial court's failure to instruct on all issues, comprise three of defendant's specifications of error. Failure to include in the record on appeal those instructions which were given prevents this court from reviewing the same to determine what was, and what was not, given. This applies to complaints about the trial court's refusal to give requested instructions (*Connell v. Norton Coca-Cola Bottling Co.*, 187 Kan. 393, 396, 357 P. 2d 804) and the other phases—that of misleading and failing to instruct on all issues—are covered in the authorities cited therein, namely, *Steck v. City of Wichita*, 179 Kan. 305, syl. ¶ 7, 295 P. 2d 1068; *Beye v. Andres*, 179 Kan. 502, 504, 296 P. 2d 1049.

An additional reason requested instruction No. 13 was properly refused is to be found in *Spencer v. Eby Construction Co.*, 186 Kan. 345, 350 P. 2d 18. Thus the trial court did not err in refusing to give the requested instructions or in giving the instructions that it did.

' Defendant complains the trial court erred in failing to sustain its demurrer to plaintiff's evidence when it was originally made and when it was renewed at the close of all the evidence together with a motion for a directed verdict. Along this line defendant states there is a direct conflict in the testimony of plaintiff's medical witnesses as to the value of the skin test and also a direct conflict among the witnesses in regard to the period of elapsed time be-

tween the skin test and the hypodermic injection of the tetanus antitoxin. The record shows there was conflict, as before stated, but there was no conflict regarding a skin test being given and plaintiff's testimony, along with that of the woman who took her to the hospital, that only five minutes elapsed between the test shot and the tetanus shot. Under such circumstances the purpose of the skin test would be totally defeated because there would not have been enough time for a reaction to take place from which a doctor could judge the advisability of giving the horse serum. In other words, the patient would not have had an opportunity to react and thus warn the doctor that some injurious result would occur in that particular patient if the tetanus shot were given. We are convinced that defendant would not give such sensitivity tests were they not of some benefit and for the purpose of avoiding such occurrences as we presently have before us.

The trial court in considering the demurrer could not rule upon the weight of the evidence if it was conflicting. Under the decisions of this court it could consider only that evidence most favorable to plaintiff, as was well stated in *Carlburg v. Wesley Hospital & Nurse Training School,* 182 Kan. 634, 323 P. 2d 638, syl. ¶ 2.

The jury returned its verdict in favor of plaintiff in the sum of $79,161.34 and answered special questions as follows:

"1. Do you find that in the treatment of plaintiff, the defendant exercised that degree of skill and care usually possessed and practiced under the circumstances in Wichita? A. No.

"2. If your answer is 'No', state in what manner the defendant failed to exercise that skill and care. A. Insufficient time allowance to determine the result of sensitivity test before injection of TAT shot.

"3. If your answer to question No. 1 is 'No', state if it could have been reasonably apprehended that plaintiff's injuries might have occurred. A. Yes, if properly handled.

"4. If you find for the plaintiff, state what act or acts of negligence was the proximate cause of any injuries to plaintiff. A. Injection of 1500 units of TAT before result of sensitivity test could be determined.

"5. If you find for the plaintiff, what do you allow for:
    "(a) Past medical and hospital expenses
        "A. $3,461.34
    "(b) Past loss of earnings
        "A. $10,800.00
    "(c) Future loss of earnings
        "A. $34,320.00
    "(d) Future medical expenses
        "A. $5,580.00
    "(e) Other
        "A. $25,000.00."

Defendant filed motions to set aside the verdict and answers to special questions, for judgment notwithstanding the verdict, and for a new trial, all of which were overruled by the trial court. The verdict of the jury was approved and judgment entered accordingly.

The special findings are in harmony with each other and with the general verdict but a question is raised as to whether the answers to special questions and the verdict were supported by the evidence. Without reviewing all the technical testimony of six well-qualified medical experts, the qualifications of none having been questioned by any of the counsel for the parties, this contention of defendant is fully answered by syllabus ¶ 3 of *Dirks v. Gates*, 182 Kan. 581, 322 P. 2d 750, which reads:

"When there is evidence, even though it may be conflicting, upon which a jury bases special findings, those findings will not be disturbed on appeal and if the special findings support and are not in conflict with the general verdict, it likewise will not be disturbed."

Thus the trial court did not err in overruling defendant's motions to set aside the verdict and answers to special questions, for judgment notwithstanding the verdict, or in holding that the verdict was not contrary to the evidence. The jurors saw this plaintiff in her present physical condition and heard the testimony, they viewed the witnesses, both lay and expert, and as reasonable persons, the jurors estimated the fair compensation due for the injuries plaintiff sustained even to the extent of setting the amounts allowed for particular elements of damages in answer to special question No. 5. Likewise, the trial court accepted and approved the answers to the special questions, adopted the verdict, and entered the amount thereof as its judgment. This court fully and clearly set out the manner in which the question of excessiveness of a verdict should be considered in *Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321, where it was stated:

"In the nature of things, it is impossible to formulate a hard and fast rule on the question of the amount of damages to be allowed in a personal injury action for the simple reason that determination of the matter necessarily depends upon the facts and circumstances of each particular case.

"Generally speaking, it may be said that no verdict is right which more than compensates, and none is right which fails to compensate. Pain and suffering have no known dimensions, mathematical or financial, and there is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of exact proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensa-

tion for the injuries sustained, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." (Syl. ¶¶ 2, 3.)

On the record before us we cannot say the amount of the verdict is such as to shock the conscience of the court and we therefore hold the verdict was not excessive.

In view of all the circumstances no reason appears why the trial court should have granted a new trial to defendant.

The judgment is affirmed.