No. 43,053

Donn Slocum, a minor, by Goldie Foster, his mother and next friend, *Appellant,* v. The Kansas Power and Light Company, a Corporation, *Appellee.*

(378 P. 2d 51)

Opinion filed January 26, 1963.

*Herbert A. Marshall,* of Topeka, argued the cause, and *Allen Meyers* and *Doral H. Hawks,* both of Topeka, were with him on the brief for the appellant.

*Lawrence D. Munns* and *Robert E. Russell,* both of Topeka, argued the cause, and *Harry W. Colmery* and *O. R. Stites, Jr.,* both of Topeka, were with them on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This is a damage action wherein the plaintiff, a fourteen-year-old boy, was injured from a high voltage electrical

transmission line while climbing in a tree and recovered a verdict in the sum of $95,000. The trial court ordered a new trial on the issue of damages, unless the plaintiff agreed in writing to accept a remittitur which would leave a judgment of $60,000 and costs. Appeal has been duly perfected from the foregoing order.

The only question presented is whether the trial court abused its discretion in finding the verdict excessive and in ordering a new trial on the issue of damages, unless the plaintiff agreed to accept the remittitur.

The trial court in considering the appellant's motion for a new trial and supplemental motion for a new trial announced that there was no valid ground for a new trial save one, and that was the possible ground that the judgment was excessive. In announcing the decision the court said:

"I have not reached any conclusion that this jury was under what I would call passion and prejudice, but I do believe that the jury was extremely generous with someone else's money and that they were possibly motivated somewhat by the fact that the defendant was a large corporation, believing perhaps that this judgment would be paid by the stockholders thereof, and not realizing that such judgments are paid by utility rate payers, if state regulation of utility rates works as it is supposed to.

"This jury awarded the plaintiff, beside some eight thousand dollars or more for his medical, three and a half times the maximum of what he would have been awarded in case of death, three and a half times the maximum allowance for his death. I do not believe the jury would have rendered this verdict if the defendant had been an individual.

"Under all these circumstances I think the verdict was excessive and I so find. I believe that, and only that reason is sufficient for granting a new trial, and that a new trial should be granted unless plaintiff will agree to a remittitur, a remittitur that will leave a judgment of $60,000.00 and costs, . . ."

Thereafter the trial court, on the appellant's motion to reconsider and clarify its order for a new trial, modified its order to the effect that if the appellant did not accept the judgment on the basis of the remittitur, the new trial be upon the issue of damages alone.

We construe the foregoing statement of the trial court to be a finding that there was no passion or prejudice involved on the part of the jury in awarding the verdict of $95,000, or that the damages awarded were so excessive as to permeate the entire verdict.

It has been held where the trial court gives the plaintiff an option to remit, or in the alternative, to submit to a new trial, it necessarily found that there was neither passion nor prejudice in connection with the verdict. It merely disagreed with the jury respecting the amount which would compensate for the plaintiff's injuries.

(*Hockman v. Candy Co.,* 104 Kan. 94, 178 Pac. 254; *Emerick v. Motor Car Co.,* 104 Kan. 136, 178 Pac. 399; *Davidson v. Douglass,* 129 Kan. 766, 284 Pac. 427; and *Blevins v. Weingart Truck & Tractor Service,* 186 Kan. 258, 349 P. 2d 896.)

In the *Emerick* case it was said:

". . . We must start with the assumption that the trial court, placed in a position far more favorable than is this court for discovering whether or not the original verdict was tainted with prejudice and passion, determined that question against the defendants' contention, holding, however, that the amount of the judgment was excessive. In such a situation, it becomes the first duty of the trial court to determine whether the excessive verdict has been rendered as a result of prejudice and passion which deprived the defeated party of a fair trial; and where the court has reason to believe this to be the case, the taint cannot be removed, nor the error cured, by merely reducing the verdict to an amount which the court thinks would compensate the injured party, if he is entitled to recover.

". . . we are confronted with the fact that the trial court saw and heard the witnesses and must have been convinced that the error of the jury in fixing an excessive amount of damages did not permeate the entire verdict. . . ." (pp. 140, 141.)

It has also been held in an action for damages for personal injuries, where there was a judgment for the plaintiff and nothing in the record to indicate passion or prejudice other than the amount of the verdict, *this court* will not require the plaintiff to accept a remittitur or grant a new trial, unless, under the facts disclosed by the record, the judgment is so large that it cannot in reason be allowed to stand. Thus, if a jury returns a verdict in excess of that which the trial court or this court deems proper under the evidence, and without any other indication of passion or prejudice on the part of the jury, the fact that the verdict is larger than the court can sustain does not require a new trial if the plaintiff is willing to consent to a proper remittitur. (*Green v. Fleming,* 126 Kan. 560, 268 Pac. 825; and *Blevins v. Weingart Truck & Tractor Service,* supra.)

In *Young v. Kansas City Public Service Co.,* 156 Kan. 624 135 P. 2d 551, this subject was discussed in the following language:

"The amount of the verdict was $10,310.45. Appellant argues a verdict in so large an amount, where the sole permanent disability is the loss of half of a hand and where there was neither lengthened sickness nor extraordinary suffering, is so excessive as to clearly demonstrate the passion and prejudice of the jury. Upon that premise it argues the verdict should have been set aside and a new trial should have been granted. It is, of course, true that a verdict actually rendered on bias, passion or prejudice cannot be permitted to stand. That is true whether the verdict be large or small. The mere fact, however, that a verdict may be excessive does not necessarily mean it was based on

passion and prejudice. It may have been occasioned by a failure of the jury to properly consider and determine what amount of money would actually compensate for the injury sustained or it may have been the result of a tendency to be somewhat generous with the money of a particular defendant. It is common knowledge juries are not always as considerate and circumspect in that regard where the defendant is a corporation as it is where the action is between individuals. While such an attitude of laymen is understandable, by reason of circumstances upon which we need not dwell now, the bench and bar also understand that compensation for damages actually sustained, and not the individual or corporate entity of the defendant, constitutes the true basis of award.

". . . In fact, there is nothing in the record which remotely indicates passion or prejudice unless it can be said to be reflected in the amount of the verdict. . . ." (pp. 628, 629.)

Another decision in point is *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 133 P. 2d 149. Other decisions treating this subject matter are *Lienbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 10 P. 2d 33, and cases cited therein; *Cox v. Kellogg's Sales Co.*, 150 Kan. 561, 95 P. 2d 531; and *Wiggins v. Missouri-K.-T. Rld. Co.*, 128 Kan. 32, 276 Pac. 63.

An examination of the record in the instant case discloses that there is nothing which remotely indicates passion or prejudice on the part of the jury, unless it can be said to be reflected in the amount of the verdict. On this point the trial court found the jury was not influenced by passion or prejudice. The trial court, in a much better position to judge the matter than this court, thought the verdict excessive and required the remittitur, if a new trial on the issue of damages was to be avoided. This further demonstrated that the trial court did not regard the amount of the original verdict as having resulted from passion or prejudice on the part of the jury, but rather discloses that it was the judgment of the court that the verdict was excessive in view of the evidence of injuries. This is in effect the opposite of a finding by the trial court that the jury was influenced in the amount of its verdict by passion and prejudice.

This court has always held that an order of the trial court allowing a motion for a new trial will not be reversed unless abuse of discretion is apparent. (*Bateman v. Roller*, 168 Kan. 111, 211 P. 2d 440; *Clark v. Southwestern Greyhound Lines*, 146 Kan. 115, 69 P. 2d 20; and *Fritchen v. Jacobs*, 138 Kan. 322, 26 P. 2d 448.)

In *Bishop v. Huffman*, 175 Kan. 270, 262 P. 2d 948, the court said:

". . . an order of a trial court sustaining a motion for a new trial will not be reversed unless abuse of discretion is apparent . . .; and that the granting of a motion of such nature rests so much in the trial court's sound

discretion that its action with respect thereto will not be held to constitute reversible error on appellate review unless the party complaining thereof has clearly established error with respect to some pure, simple, and unmixed question of law . . ." (pp. 274, 275.)

The above language was quoted in *Nicholas v. Latham,* 179 Kan. 348, 295 P. 2d 631; and *Crockett v. Missouri Pacific Rld. Co.,* 188 Kan. 518, 363 P. 2d 536.

The same rule applies where the trial court finds the verdict excessive and orders a new trial on the issue of damages, unless the plaintiff agrees to accept a remittitur.

Furthermore, this court has held where a trial court may rightfully exercise a large discretion in the matter of granting or refusing a new trial, that a much stronger showing with respect to abuse of discretion is required where a new trial has been granted than where it is refused, and this court will not reverse the trial court's ruling unless satisfied that it was wholly unwarranted and an abuse of its discretion. (*Bateman v. Roller,* supra; and *Sundgren v. Leiker,* 180 Kan. 617, 305 P. 2d 843.)

The same rule applies where the trial court finds the verdict excessive and orders a new trial on the issue of damages, unless the plaintiff agrees to accept a remittitur.

The question therefore resolves into whether the trial court abused its discretion in finding the verdict excessive in view of the evidence of injury presented by the record.

The appellant contends "The trial court did not find that its conscience had been shocked by the amount of the verdict, and did not find that there was any indication of improper action, or passion or prejudice on the part of the jury. It simply felt that the verdict was excessive, and, in effect, that the verdict was more than the judge would have given if he had been on the jury, or trying the case himself. This is not sufficient ground or reason to change or reduce a jury's verdict, and constitutes nothing more than substituting the judgment of the court for that of the jury, and thus, in effect, deprived plaintiff of his right to a jury trial. . . ."

Cases upon which the appellant relies (*Domann v. Pence,* 183 Kan. 135, 325 P. 2d 321; *Knoche v. Meyer Sanitary Milk Co.,* 177 Kan. 423, 280 P. 2d 605; *Spencer v. Eby Construction Co.,* 186 Kan. 345, 350 P. 2d 18; *Neely v. St. Francis Hospital & School of Nursing,* 188 Kan. 546, 363 P. 2d 438; and others) are all situations in which the Supreme Court was requested to pass upon a verdict as being

excessive in the first instance, and the court in upholding the respective verdicts said that jury verdicts should be approved unless they are palpably and conclusively excessive—that the jury is entrusted with the job of determining the fair amount of compensation for injuries.

The general rule is that the Supreme Court will not require the plaintiff to accept a remittitur or grant a new trial, unless under the facts disclosed by the record, the judgment is so large that it cannot in reason be allowed to stand. (*Blevins v. Weingart Truck & Tractor Service,* supra.)

The situation presently confronting the court was not, however, the focal point of the court's attention when the language relied upon was used in upholding the respective verdicts in those cases.

Contrary to the appellant's contention, we think the trial court's action in ordering a remittitur indicates that its conscience was sufficiently shocked by the amount of the verdict to warrant such action.

The appellant argues the trial court was influenced by passion and prejudice in ordering a remittitur as indicated by his remarks in announcing the decision. The appellant seizes upon the remarks that the jurors were extremely generous with someone else's money and that they were possibly motivated somewhat by the fact that the defendant was a large corporation. Language used by this court in *Union Pacific Rly. Co. v. Milliken,* 8 Kan. 647, recognized that suits for damages against corporations average larger verdicts than like suits against individuals and discussed this point in substantially the same manner as the trial court.

The comparison made by the trial court of the damages awarded in this case with the maximum that could have been awarded in case of death is seized upon by the appellant, but here again similar language was used in the *Milliken* case by comparing the amount of the verdict for the loss of one hand, which was amputated just above the wrist, with the amount authorized under the wrongful death statute. On these points the appellant's contentions are without merit and deserve no further consideration.

The evidence in this case disclosed that the appellant sustained injury while he and another playmate were climbing in a tree located upon the property of the residence in which the appellant and his parents lived. The tree was a large spreading tree which had branches extending over and beyond the roadway running to the

front of the home. Electrical transmission lines of the appellee were located over the road right-of-way, approximately thirty feet above the ground, and the electrical transmission line ran through a big hole cut in the tree for the express purpose of providing clearance for and visibility of the electrical transmission line. The injury occurred when the appellant in some manner, which is not exactly disclosed in the record, came in contact with the appellee's electrical transmission lines.

The parties stipulated at the trial that the appellant's past expenses and past medical bills, including nursing and mileage, totaled $7,305.32. They further stipulated that the appellant, at fourteen years of age, would have a life expectancy of 57.72 years.

Regarding future medical expense, Dr. Omar M. Raines testified in effect that whether the appellant's left arm would be amputated would be a decision for the appellant to make in the future. He estimated the expense of such an operation to be a maximum of $730 plus the cost of an artificial arm at between $200 and $450.

There was no other evidence introduced of any other actual monetary damages to the appellant, nor was there any evidence of anticipated future loss of earnings as a result of his injury.

In addition to the complete loss of the appellant's left hand and forearm, he has lost the middle finger of his right hand, and has injuries to the index and ring fingers of his right hand. As to the right arm and hand Dr. Robinson, the appellant's witness, testified that "Except for the fact there is something wrong with the other hand that doesn't really bother too much." The appellant also sustained a severe electrical shock and has large areas of scarring on his stomach and on both the inner and outer thighs of his legs. As to these injuries Dr. Robinson testified:

"A. . . . The other burns and other scars, although evident to see, don't cause him any real disfunction.
"Q. And he has good function of his legs?
"A. Yes, as far as I know."

The evidence discloses the appellant has spent almost one hundred sixty days in hospitals for the treatment of these injuries, which were described by Dr. Raines as among the most painful that can be endured by mankind.

The testimony indicated that at the time of the trial the appellant had improved in his class work and activities. The appellant himself testified that he was getting along pretty well in school and was doing better than he did the previous year.

After a careful examination of the record in this case the majority of the members of the court are of the opinion that the trial court did not abuse the exercise of its power of discretion in ordering a new trial on the issue of damages, unless the plaintiff agreed in writing to accept a remittitur which would leave a judgment of $60,000 and costs.

The judgment of the lower court is affirmed.

WERTZ, J. (dissenting): I am unable to agree with the majority opinion of the court, and I will set forth my views wherein I differ.

A few of the pertinent facts relating to plaintiff's extensive permanent injuries, disability and terrible suffering going to justify the verdict returned by the jury are as follows:

Donn Slocum, an active twelve-year-old boy at the time of his accident, came into contact with a noninsulated power line carrying 13,800 volts of electricity. The current entered his left hand, charred to a crisp the muscle, fascia, fat and tendons of that hand and wrist, passed through his body and came out the anterior thighs of both legs and the back of the knee and calf of the left leg, leaving burns on his legs that went to the bone. His right hand was also affected by the charge.

He was taken to Stormont-Vail hospital and confined there for a total of eighty-seven days, during which time he underwent two operations of two to three hours' duration for skin grafts and amputation of the middle finger of the right hand. As testified to by the attending physician, the boy suffered shock most of the time he was in the hospital and "a terrific amount of pain." When asked to compare the pain in this type of case with other pain that people suffer the doctor testified, "I don't think there is anything worse, I think this is one of the worst pains that we have." The doctor further testified it is rather remarkable, with burns as extensive as this boy had and as deep as he had, that he survived; also, that his progress was very slow and very painful.

For a period of well over two months after his release from Stormont-Vail until the time he was taken to the Kansas University Medical Center in January, 1960, the boy had to be returned to the hospital two or three times a week for dressings, during which time, according to the testimony, his legs and arm were still painful. In February, 1960, he was again taken to the KU Medical Center at which time, by surgical procedure, the ring and middle fingers of his left hand were amputated. Because the hand was bent in a turned-

over position the ligamentous attachment between the bones of the forearm was cut and a pin was driven across the two bones to hold the hand in a more supinated position. Then his wrist was sewed to his stomach for the purpose of skin graft. This operation forced the boy to remain in an uncomfortable humped position for more than a month, after which time he was returned to surgery, cut free from this position, and a piece of loose skin was sewed to his arm and additional skin was taken from his leg and grafted to his abdomen.

The boy underwent three additional operations at the KU Medical Center, one of which was a nerve graft. The ulnar nerve was borrowed as a cable out of the forearm, which necessitated extending the incision back up the forearm another six to eight inches, and was pieced into the missing gap of the median nerve across the big defect, operating through the abdominal wall flap that had been applied to the wrist. This operation was performed in an attempt to restore feeling to any part of the hand, the hand being totally anesthetic on its palmar side. Six months after the nerve graft operation a muscle transplant was performed whereby the plantaris tendon was borrowed out of his leg, hooked into the flexor motor mechanism of the left forearm, a tunnel made for it under the abdominal graft on the wrist and hooked into the remains of the tendons in the wrist. Four months later another muscle transplant operation was performed whereby a tendon was transferred from the back of the hand into the index finger. These operations were performed in an endeavor to restore motion to the fingers in order that the boy could have some use of his hand.

There was testimony that each of the five operations was from four to seven hours in duration. As shown by the doctor's testimony, the operations were very disappointing. The usefulness of the plaintiff's left hand compared to a normal hand is, in the words of the doctor, "practically zero." And the doctor further testified, "As to the importance, of course, for the doing of bi-manual jobs, the way the hand is now, he is not going to be able to use it for a bimanual job. I would consider it practically 100 per cent disability." Further testimony brought out the fact there were scars from the burns on both legs and the abdomen, and the possibility exists of having to amputate the entire left arm in the future; that there was atrophy of the thighs and calves of both legs; that the medical expense incurred by the plaintiff to the date of the trial amounted to $7,305.32; and that the boy at

the time of the trial had a life expectancy of 57.72 years. The doctor testified that in the event of a later amputation the total cost, including an artificial arm, would run between $700 and $1,100.

As shown by the record, Donn Slocum suffered severe electrical shock; has undergone surgery seven times; was confined in the hospital for a total of 160 days; made innumerable trips to the hospital as an out-patient for dressings, treatments and observation; suffered injuries described as among the most painful that can be endured by man; has permanently lost the use of his left arm, wrist and hand; suffered deep burns on both legs and permanent scars thereto; lost the middle finger of the right hand and suffered injury to the index and ring fingers of that hand; missed one full year of school and the major part of another, and because of his disability was unable to take courses in industrial arts; faces future possibility of amputation of his left arm and the need of an artificial limb; and must bear for his lifetime injuries that are disfiguring and unsightly as well as severly and permanently disabling.

With this and other evidence before it, the jury returned a general verdict in favor of plaintiff for $95,000. The trial court found that the jury was not under what it would call passion and prejudice. However, the trial court ordered the remittitur or a new trial on the question of damages only. The rule of law in this state is that after a jury returns a verdict for the plaintiff in a personal injury action absent passion and prejudice, the trial court or this court may order a remittitur or a new trial at the option of the plaintiff, *but only* when the evidence will not support the sum allowed or the sum itself is so large as to shock the conscience of the court. (*Watson v. Parker Township*, 113 Kan. 130, 136, 213 Pac. 1051; *Blackman v. Honer*, 119 Kan. 404, 406, 239 Pac. 750; *Green v. Fleming*, 126 Kan. 560, 562, 268 Pac. 825.) In the instant case the trial court used neither of these rules. The trial court reasoned that the verdict was excessive, not because the evidence did not support the verdict or that his judicial conscience had been shocked, but because the jury was generous with someone else's money and they were possibly motivated by the fact defendant was a large corporation, or perhaps the jury felt the judgment would be paid by the stockholders instead of the utility rate payers, and damages were three and one-half times that allowable for death.

The ancient rule followed by this court for the assessment of damages is just compensation for the loss or damage sustained.

No verdict is right which more than compensates; none which fails to compensate. (*Union Pac. Ry. Co. v. Milliken,* 8 Kan. 647, 655.) A verdict is excessive when it overcompensates a plaintiff. The excessiveness of a verdict is not measured by the ability of a defendant to respond or pay or the fact that the economy might be changed or, as in the instant case, that electric light bills might be increased. It is of no concern to the jury or the trial court how or by whom the judgment will be paid.

In the words of Justice Musmanno of the supreme court of Pennsylvania in *Spangler v. Helm's N.Y.-Pgh. M. Express,* 396 Pa. 482, 485, 153 A. 2d 490:

"It is not acceptable to say that a jury has no comptometer with which to total up values assignable to economy, industry, attention and tender solicitude. Difficulty of computation is not a barrier to full recovery. The commission of a wrong carries with it the duty to make amends. And if the mending process is additionally expensive because of problems encountered in ascertaining the cost of the rehabilitating agents, that process becomes part of the obligation the tort-feasor must assume. As between the innocent victim of a wrong and the person who accomplished the wrong, the law imposes on the malfeasor the obligation to make the victim whole in every phase in which the victim has suffered, to the extent that rehabilitation is possible in terms of money. And when the jury has made its calculation and has spoken that calculation through its verdict, the verdict is not to be disturbed unless there comes to light some misconduct or misapprehension on the part of the jury, none of which, of course, is evident in the case at bar."

Early in the history of our country (1812) Chief Justice Kent in *Coleman v. Southwick,* 9 Johns., N. Y., 45, 6 Am. Dec. 253, stated the rule applicable to the question involved in this case.

"The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say, that in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries.

. . . . . . . . . . . . . .

"The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess."

This court recognized the logic and reason enunciated by the celebrated Chancellor Kent in the case of *Domann v. Pence,* 183 Kan. 135, 141, 325 P. 2d 321, where it said:

Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, *and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence."* [Emphasis supplied.]

An award of damages, though liberal, will not be set aside as excessive where it is not disproportionate to the injuries suffered and it does not appear that the jury acted under bias, prejudice, improper influence or some mistake of fact or law. (*Pearson v. Hanna,* 145 Me. 379, 70 A. 2d 247, 16 A. L. R. 2d 1.)

As was said in the Pennsylvania case, while there is no standard voltage for judicial shock, the situation which so upsets the judge's equanimity as to justify the upsetting of a jury's verdict must be one which would disturb a person of average sensibilities—not one of exaggerated reflexes. The standard of shockability depends upon normal reactions. It is how the person conscious of commodity prices would apply an announced amount of money to necessary purchases. These values naturally must be considered in terms of present purchasing power and not that of decades ago. It was further stated in the Pennsylvania case:

"The person who shocks in 1959 at what he must expend for a good meal or a night's lodging as against what he paid for the same items 20 years ago will find himself living in a state of constant concussion because the cost of everything is higher today than it was before the silver dollar began its Cape Canaveral ascent into the spiral spaces of inflation."

Attention is invited to an article written by Judge David Prager on *Computation of Damages in Personal Injury Cases,* 4 Kan. L. Rev. 91, wherein Judge Prager reviews some of our Kansas cases including the elements of damage in personal injury cases covering medical and hospital expenses, loss of time, physical pain and suffering including fright, terror, grief and shock accompanied by personal injury, mental anguish resulting from mutilation or disfigurement and personal disability or loss of future earning capacity. What is said with reference thereto on pages 94 and 95

will suffice here, and what he has to say in his introductory remarks are fitting in the instant case:

"In the wake of crippling injuries comes pain, family hardship, mental anguish and suffering, brooding, feelings of shame, embarrassment, humiliation, fears of pity and poverty, and loss of the ability to support one's self and family. At the same time the flow of earnings to the family reservoir ceases. If the man is so badly injured that he cannot return to work, or if he can only do the work of part of a man, then the injured and his family may soon be cast as parasites upon their relatives and friends, or as beggars upon charity and the community.

"In this time of great adversity, the injured person turns to the courts to protect his rights and to grant him· whatever remedies the justice of his case allows."

It is noted the majority opinion says that there was no evidence of anticipated future loss of earnings as a result of plaintiff's injury. All that need be said on this issue is that this court unequivocally has stated in *Ladd v. Railway Co.*, 97 Kan. 543, 155 Pac. 943, that a person whose capacity to labor has been permanently diminished by physical injury wrongfully inflicted upon him by another can recover damages therefor, notwithstanding there may not have been any proof as to what such person's earnings were before or after the injury. If proof of actual earnings before and after an injury were required, then an injured child, as in this case, could not recover for loss of future earning capacity, which, of course, would be neither equitable nor just. The plaintiff's permanent injuries, as related, stand as sufficient proof of his inability to adequately compete in any respect in the open market in future years.

This court has stated that where a judgment is rendered for the plaintiff in a personal injury action and there is nothing in the record to indicate passion or prejudice other than the amount of the verdict, this court will not require the plaintiff to accept a remittitur or grant a new trial unless under the facts disclosed by the record the judgment is so large that it cannot in reason be allowed to stand. (*Blevins v. Weingart Truck & Tractor Service*, 186 Kan. 258, 263, 349 P. 2d 896.) In this jurisdiction juries today are composed of men and women of standing in the community. They are farmers, merchants, scientists, bankers, engineers, industrialists, laborers, professional tradesmen and businessmen of all kinds. They come from all walks of life and are a cross section of the citizenry of our community. They possess the senses of justice and right between man and man. They recognize their sworn duty to follow the trial court's instructions as to the law

applicable to the facts in the case; and, as this court has said, until the contrary is shown it will be presumed that a jury acted fairly, reasonably, intelligently and in harmony with the evidence. (*Henderson v. Kansas Power & Light Co.*, 188 Kan. 283, 289, 362 P. 2d 60.)

When a jury has conscientiously weighed the evidence and in accord with their sworn duty has returned, absent passion and prejudice, a verdict they believe fully compensates an injured plaintiff, a trial judge should not tamper with the verdict or order a remittitur unless the verdict transcends all reason. Every time a judge orders a remittitur he is impinging upon the province of the jury, and our judicial system of trial by jury necessarily suffers.

The right to a jury trial is part of the birthright of every free man. It is a right that is justly dear to the American people. To say in one breath that the jury is the ultimate trier of fact that weighs the evidence and assesses damages for wrongs committed but that a judge can reduce the amount of a verdict for any insignificant reason is abhorrent to our system of jurisprudence. The verdict in the instant case was certainly reasonable under the evidence, but the reasons assigned for reducing the verdict were not judicially sufficient and, in fact, were contrary to the rules followed by this court.

I am of the opinion not only did the trial court abuse its judicial discretion but also usurped, under its finding, the sole function of the jury. I am of the further opinion that the judgment of the trial court should be reversed and the case remanded with instructions to enter judgment on the verdict of the jury.

Robb and Fatzer, JJ., join in the foregoing dissent.