No. 61,945

KANSAS MALPRACTICE VICTIMS COALITION and the Members, Named and Unnamed, Thereof; CLAYTON TREVOR NYGAARD, a minor, by his father and next friend, TERRENCE W. NYGAARD; ERIC THEODORE NYGAARD, a minor, by his father and next friend, TERRENCE W. NYGAARD; BRENT WILLIAM OLSEN, a minor, by his father and next friend, ROBERT A. OLSEN; and MARY DUNCAN, Guardian and Conservator of ELLEN BANISTER, a disabled person, *Plaintiffs-Appellees,* v. FLETCHER BELL, *Defendant-Appellant,* and KANSAS MEDICAL SOCIETY, KANSAS HOSPITAL ASSOCIATION, and Attorney General ROBERT T. STEPHAN, *Intervenors-Appellants.*

(757 P.2d 251)

Opinion filed June 3, 1988.

*Wayne T. Stratton,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause, and *Charles R. Hay,* and *Michael W. Merriam,* of the same firm, were with him on the brief for intervenors-appellants Kansas Medical Society and Kansas Hospital Associations.

*Thomas L. Theis,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Pamela Sjoholm Scott,* chief attorney, Kansas Department of Insurance, and special assistant attorney general, was with him on the briefs for appellant Fletcher Bell.

*Thomas E. Sullivan,* of Thomas E. Sullivan, P.A., of Overland Park, and *Lynn R. Johnson,* of Shamberg, Johnson, Bergman & Goldman, Chartered, of Overland Park, argued the cause, and *G. Gordon Atcheson,* of Shamberg, Johnson, Bergman & Goldman, Chartered, of Overland Park, *Sidney A. Shapiro,* of Lawrence, and *Jerry R. Palmer,* of Palmer, Marquardt & Snyder, P.A., of Topeka, were with them on the brief for appellees.

*Robert T. Stephan,* attorney general, and *Nancy L. Ulrich,* assistant attorney general, were on the brief for intervenor-appellant Robert T. Stephan.

*Jeffrey Robert White,* of Washington, D.C., and *Leonard D. Fisher,* of Schroer, Rice, P.A., of Topeka, were on the *amicus curiae* brief for the Association of Trial Lawyers of America, Distressed Parents Together Foundation, and Consumer Federation of America.

*John B. Runnels, M.D.,* of Topeka, was on the *amicus curiae* brief pro se.

The opinion of the court was delivered by

PRAGER, C.J.: This is a declaratory judgment action brought by the Kansas Malpractice Victims Coalition (plaintiffs/appellees), a group of named and unnamed medical malpractice victims, against Insurance Commissioner Fletcher Bell (defendant/appellant) in his capacity as administrator of the Health Care Stabilization Fund (Fund). Plaintiffs seek to prevent enforcement of 1986 House Bill 2661, a bill containing a variety of tort reforms and limiting the recovery allowed in medical malpractice actions. (K.S.A. 40-3401 *et seq.* and K.S.A. 1987 Supp. 60-3401 *et seq.*) The trial court granted summary judgment for the plaintiffs, ruling that certain new laws violated several constitutional provisions.

At the district court level, the Kansas Medical Society, the Kansas Hospital Association, and Attorney General Robert T. Stephan intervened on behalf of the defendant. On appeal, the Association of Trial Lawyers of America, the Distressed Parents Together Foundation, and the Consumer Federation of America appear as *amici curiae.* John B. Runnels, M.D., appears pro se, also as *amicus curiae.*

## FACTS

H.B. 2661 was enacted in 1986 following a lengthy interim study and protracted debate in both houses of the Kansas Legislature. The bill was designed to reduce the cost of medical malpractice insurance coverage for Kansas doctors. To achieve that end, the bill capped total recovery in medical malpractice actions at $1,000,000 and also limited recovery for noneconomic loss to $250,000. In addition, the bill required that any recovery for future loss be invested in an annuity with regular payments to the plaintiff over a number of years. The annuity is to be owned not by the injured person, but by the Fund.

Plaintiffs first filed suit in Johnson County, alleging in their petition that H.B. 2661 impaired their rights to full recovery for

their injuries and that any action by defendant to implement the bill was unconstitutional. The defendant immediately moved for a change of venue, which was granted. The action was then transferred and argued in Shawnee County pursuant to K.S.A. 60-602(2).

The parties entered the entire legislative history of H.B. 2661 into the court file. That history included hundreds of pages of testimony and stacks of statistics. Based on the information contained in the record, plaintiffs moved for summary judgment. Judge Franklin R. Theis reviewed the arguments and concluded that H.B. 2661 violated various sections of the Kansas Constitution. He granted summary judgment for plaintiffs, and defendant and intervenors appealed directly to this court under K.S.A. 1987 Supp. 60-2101(b).

## ISSUES TO BE DETERMINED

I. Whether the cap and annuity provisions of H.B. 2661 violate Section 5 of the Bill of Rights of the Kansas Constitution.

II. Whether the cap and annuity provisions of H.B. 2661 violate Section 18 of the Bill of Rights of the Kansas Constitution.

III. Whether the cap and annuity provisions of H.B. 2661 violate Section 1 of the Bill of Rights of the Kansas Constitution.

IV. Whether the trial court erred in severing various provisions of H.B. 2661 and in refusing to sever other provisions.

## HISTORY AND ANALYSIS OF LEGISLATION

The statutes presented here for review do not represent the legislature's first attempt to regulate litigation in the medical malpractice area. In the early 1970s, insurers, who had previously underwritten medical malpractice insurance policies, abandoned the market in response to increasing claims and decreasing profits. Comment, *Caps, "Crisis," and Constitutionality—Evaluating the 1986 Kansas Medical Malpractice Legislation,* 35 Kan. L. Rev. 763, 765 (1987). As a result, health care providers found it difficult to obtain insurance.

In 1976, the Kansas Legislature responded to this "availability crisis" by enacting the Health Care Provider Insurance Availability Act. K.S.A. 40-3401 *et seq.* This act required all health care

providers to carry medical malpractice insurance as a condition precedent to practicing in Kansas. K.S.A. 40-3402. Under K.S.A. 1987 Supp. 40-3401, "health care providers" is defined to include not only physicians but also persons engaged in certain medical training programs, hospitals, medical care facilities, optometrists, podiatrists, pharmacists, nurse anesthetists, dentists, physical therapists, and others. If a provider could not procure malpractice insurance on the outside market, he could apply for and receive insurance from the state-created Joint Underwriting Association (JUA). Every provider would then have primary coverage of $100,000 per occurrence and $300,000 annual aggregate. (These amounts were raised in 1984 to $200,000 and $600,000, respectively. [K.S.A. 40-3402]) Doctors insured by the JUA pay 20% more for their coverage than doctors covered by market insurance groups. The JUA is funded through the Fund, a state-run insurance company designed to provide additional insurance coverage above the primary coverage limits to all health care providers.

The Fund and the JUA are closely related, and to understand the so-called 1985 "crisis" in medical malpractice insurance, it is vital to understand the interworkings of the two. The Fund is administered by the Kansas Insurance Commissioner and is funded through surcharges based on premiums paid by health care providers for their primary coverage. For example, if a physician pays $5,000 for his primary coverage and the Fund surcharge is 50%, he will pay $7,500 for total insurance coverage. ($5,000 + [.5 x $5,000] = $5,000 + $2,500 = $7,500.) The surcharge is determined on a yearly basis and is designed to maintain an adequate balance in the Fund. Enabling legislation required that a surcharge be levied until the Fund had a $10,000,000 balance. This limit was reached in four years, and no surcharge was then levied from 1981 to 1983. This meant that all doctors in Kansas had free, unlimited coverage above the primary coverage for three years. More than $27,000,000 in settlements and awards were incurred during this time period. By 1986, the Fund was insolvent and doctors were assessed a 110% surcharge, a third of which was designed to make up for losses incurred during the three "free" years. In 1984, liability of the Fund was capped at $3,000,000. L. 1984, ch. 178, § 1.

Fund losses were further aggravated by the JUA. Because the JUA insures doctors who cannot procure insurance in the free market, it, in effect, insures uninsurable risks. In 1985, 250 health care providers were insured by the JUA. The Fund pays out every dollar assessed in claims against these providers, while, for other doctors, the primary carrier pays out the first $200,000 of any award. According to the administrator of the JUA, a small number of JUA-insured doctors were responsible for a large percentage of the losses incurred by the Fund.

Apparently, the mere existence of the Fund created problems. Insurers refused to enter a market where the State was involved, because this reduced competition. The Fund also monopolized the highly profitable excess insurance market, thus reducing the incentive for insurance companies to enter Kansas.

Thus, while the Health Care Provider Insurance Availability Act guaranteed the *availability* of insurance to all Kansas doctors, it played a strong role in bringing about (or at least aggravating) the 1985-86 crisis of medical malpractice insurance *affordability*. The 1976 legislation did little to reduce the number of claims made or the severity of those claims. Both continued in a steady upward spiral. Medical malpractice insurance premiums became increasingly expensive, multiplying five times in five years for some Kansas doctors. Still, 42% of Kansas doctors paid $3,000 or less for total insurance coverage (including an 80% surcharge) in 1985.

In 1985, the Kansas Legislature directed an interim study on the "crisis." The end result was H.B. 2661, a major package of tort reform provisions. The measure passed quickly and became law on July 1, 1986. L. 1986, ch. 229, § 53. Here is a sample of how the bill works:

Section 13, K.S.A. 1987 Supp. 60-3407, limits recovery to $250,000 for all "noneconomic loss." Noneconomic loss is not defined in the act. Under K.S.A. 1987 Supp. 60-3406, "noneconomic loss" would include all damages other than costs of medical care and related benefits, lost wages, loss of earning capacity, and other "economic losses." Noneconomic loss would thus include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, or losses which cannot be easily expressed in dollars and cents. The total amount

of recovery (including both noneconomic and economic damages) is limited to $1,000,000. Any recovery for future economic loss must be reduced to present value and must be invested in an annuity contract. The method of computing all these damages is based on an itemized jury verdict form which requires the jury to specifically determine noneconomic damages, present economic damages including lost wages and medical expenses, future economic loss, and the period of time over which payment of future economic loss will be needed.

The successful plaintiff is first awarded the total amount of his noneconomic loss up to $250,000. He also receives the total amount of his present medical and related expenses and economic losses so long as the total of his noneconomic loss and present medical expenses does not exceed $1,000,000. For example, if a plaintiff is awarded $200,000 for noneconomic loss and $800,000 for current medical expenses, he will receive the total amount awarded. If, however, his current expenses are $900,000, he will receive only $800,000 ($1,000,000 - $200,000 = $800,000). Assuming that the total is less than $1,000,000, the plaintiff is then awarded the present value of his future medical expenses and related benefits. That award, added to the non-economic loss and current medical expenses, must also come under the $1,000,000 cap. For example, if plaintiff's noneconomic loss and current economic loss equal $750,000, he could receive up to a limit of $250,000 for all future benefits and his recovery will be cut off at that point.

Any award for future benefits must be used to purchase an annuity contract which will pay out benefits for the amount and number of years set by the jury. The Fund holds the annuity as owner and directs the payments to the plaintiff as they are paid out. The plaintiff has no rights to the annuity and cannot assign any benefits he is to receive. K.S.A. 1987 Supp. 60-3409.

If a plaintiff receives a judgment that exceeds the $1,000,000 cap and the amount awarded for future medical costs is insufficient, he may later petition the trial court for supplemental benefits to pay only future medical care and related benefits up to a total of $3,000,000. Those benefits also may be provided by an annuity. This section is known as the "pinhole" provision. K.S.A. 1987 Supp. 60-3411. If the plaintiff successfully petitions

the court under the pinhole provision, the Fund can be held liable for up to the full amount of the jury's award of damages, not exceeding $3,000,000. Should a plaintiff be awarded a $6,000,000 judgment, only $3,000,000 of it could possibly come from the Fund. Prior to 1984, the Fund would have covered the entire amount. It is important to point out that a limitation on liability of the Fund is *not* an issue here. Because the Fund is a state-run insurance company, the State is free to limit its liability in any amount it wishes. The issue presented here is one of limiting *the liability of a tortfeasor*, namely the negligent health care provider. It is this limitation which plaintiffs claim violates the Kansas Constitution.

While H.B. 2661 made sweeping changes in the amount injured patients could recover, it did not change the underlying obligation of a health care provider toward his patients. Every health care provider has the duty to use reasonable and ordinary care and to exercise that reasonable degree of learning, skill, and experience which is ordinarily possessed by other health care providers in the same location. *Durflinger v. Artiles*, 234 Kan. 484, 489-90, 673 P.2d 86 (1983) (quoting *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 375, 552 P.2d 885 [1976]). See PIK Civ. 2d 15.01. The injured patient must prove a breach of that professional duty and a causal connection between the breach and the injury. The law also requires that plaintiff prove actual damages. *Durflinger v. Artiles*, 234 Kan. at 488.

These requirements mean that, in the absence of misconduct which an ordinary layman would obviously consider to be negligent, no plaintiff can be successful in an action against a health care provider without competent expert testimony that the defendant's behavior fell below a reasonable standard of care. No liability arises merely from bad medical results. *Voss v. Bridwell*, 188 Kan. 643, 652, 364 P.2d 955 (1961) (quoting *Goheen v. Graber*, 181 Kan. 107, 112, 309 P.2d 636 [1957]). The difficulty of recovering damages in a medical malpractice case is extreme. It has been estimated that only 10% of all claims filed result in a plaintiff's verdict.

There are certain statistics which were apparently undisputed at the legislative hearings and which are included in the appendices of the briefs of defendant and the intervenors. They are as follows:

1. In fiscal year 1987, there were 21 medical malpractice cases in Kansas district courts that were decided by a jury. Of these, there were 13 defendant's verdicts and 8 plaintiff's verdicts. Only one verdict exceeded $1,000,000.

2. Less than 15 persons over the last 10 years would fall into the category of being affected by the $1,000,000 cap.

3. From 1976 to July 1, 1985, the Fund settled and paid in 135 cases. In only 7 cases did the Fund pay more than $1,000,000. This is 5.9% of the total.

### CONSTITUTIONAL PROVISIONS

The Kansas constitutional provisions which are involved in this case are as follows:

### "BILL OF RIGHTS

"**§ 1. Equal rights.** All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.

. . . .

"**§ 5. Trial by jury.** The right of trial by jury shall be inviolate.

. . . .

"**§ 18. Justice without delay.** All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Before considering the constitutional issues presented on this appeal, we must consider the obligation of this court to protect the Kansas Constitution from encroachment by legislative action. "This court is by the Constitution not made the critic of the legislature, but rather, the guardian of the Constitution." *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 760, 408 P.2d 877 (1965). The constitutionality of a statute is presumed, and all doubts must be resolved in favor of its validity. Before a statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *Brown v. Wichita State University (Brown II),* 219 Kan. 2, 9-10, 547 P.2d 1015 (1976) (citing *Moore v. Shanahan,* 207 Kan. 645, 651, 486 P.2d 506 [1971], and *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748).

This case involves the rights of a citizen to a jury trial, equal

protection of the laws, and a remedy by due course of law, all of which are guaranteed by the Bill of Rights of the Kansas Constitution. Justice Brewer, over 100 years ago wrote that "The bill of rights is something more than a mere collection of glittering generalities." *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, Syl. ¶ 1, 3 Pac. 284 (1884). He noted that those rights were "binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." 31 Kan. 660, Syl. ¶ 1. The Bill of Rights protects the basic liberties which inure to each person at birth.

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), Chief Justice Marshall stated that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."

In *Harris v. Shanahan*, 192 Kan. 183, 387 P.2d 771 (1963), Justice Fatzer described this court's duty to protect the Kansas Constitution in the following language:

"So there could be no mistake about its object and purpose, the American Republic officially and with the first breath of its new life declared, 'that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.' (The Declaration of Independence.) This is the American proclamation of freedom and equality, and the individual worth of a single human being. . . .

. . . .

"It is sometimes said that courts assume a power to overrule or control the action of the people's elected representative in the legislature. This is a misconception. . . . The judiciary interprets, explains and applies the law to controversies concerning rights, wrongs, duties and obligations arising under the law and has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people. In this sphere of responsibility courts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such a case lies with the people. But when legislative action exceeds the boundaries of authority limited by our Constitution, and transgresses a sacred right guaranteed or reserved to a citizen, final decision as to invalidity of such action must rest exclusively with the courts. In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas. (*Quality Oil Co. v. du*

*Pont & Co.*, 182 Kan. 488, 493, 322 P.2d 731.) However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it." pp. 204, 206-07.

During the past year, our people have been celebrating the Bicentennial of the United States Constitution. From state and national programs, our people have learned the importance of protecting the individual from encroachment by the majority or those in positions of power, no matter how well-meaning. Without the concept of equal justice for all, our basic liberties would have disappeared from the scene years ago.

The Bill of Rights of the Kansas Constitution and the Bill of Rights of the United States Constitution are there to protect every citizen, including a person who has no clout, and the little guy on the block. They are there to protect the rights of a brain-damaged baby, a quadriplegic farmer or business executive, and a horribly disfigured housewife who is a victim of medical malpractice. They are not there to see that the will of the majority is carried out, but to protect the rights of the minority. It is the obligation of this court in each case to carry out its constitutional responsibility. With that obligation in mind, we now turn to the issues involved in the case now before us.

I. Whether the cap and annuity provisions of H.B. 2661 violate the right to trial by jury under Section 5 of the Bill of Rights of the Kansas Constitution.

Section 5 of the Bill of Rights of the Kansas Constitution provides that the right of trial by jury shall be inviolate. It guarantees the right of every citizen to trial by jury. " 'The right of trial by jury is a substantial and valuable right. The law favors trial by jury and the right should be carefully guarded against infringement.' " *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 520, 664 P.2d 813 (1983) (quoting *Bourne v. Atchison, T & S. F. Rly. Co.*, 209 Kan. 511, 497 P.2d 110 [1972]). "Trial by jury is guaranteed only in those cases where the right existed at common law." *Kimball et al. v. Connor et al.*, 3 Kan. *414, *432 (1866). Common law allows for the recovery of damages for negligent injury (*Tefft v. Wilcox*, 6 Kan. *46 [1870]), and therefore the right to jury trial applies here.

Kansas cases hold that the right to a jury trial includes the right to have a jury determine damages. Plaintiffs contend that the cap provisions of H.B. 2661 impair the right to a jury trial "by truncating the jury's ability to fix damages."

The jury's traditional role is to decide issues of fact. *Hasty v. Pierpont*, 146 Kan. 517, 520-21, 72 P.2d 69 (quoting *Walker v. Southern Pacific Railroad*, 165 U.S. 593, 596, 41 L. Ed. 837, 17 S. Ct. 421 [1897]). The determination of damages is an issue of fact. Therefore, it is the jury's responsibility to determine damages. Yet H.B. 2661 sets a limit on the recovery of damages, thereby restricting before trial the amount of damages available to those most severely injured. It also restricts access to whatever recovery is received, through the requirement of annuities. In other words, for a plaintiff who sustains massive injuries and to whom a jury awards $4,000,000, H.B. 2661 makes the determination that $1,000,000 is all the plaintiff needs. For a plaintiff who suffers any extreme pain and disfigurement, a limit of $250,000 is imposed. When the trial judge enters judgment for less than the jury verdict (as H.B. 2661 directs him to do) and orders an annuity contract, he clearly invades the province of the jury. This is an infringement on the jury's determination of the facts, and, thus, is an infringement on the right to a jury trial.

Further support for the conclusion that Section 5 includes the right to have a jury determine damages comes from the ancient distinction between legal and equitable actions. At common law and under the Kansas Constitution, a party in a suit in equity (such as an action for specific performance, foreclosure, or to quiet title) is not entitled to a trial by jury. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517. On the other hand, suits seeking monetary recovery or money damages have always been considered actions at law which must be considered by a jury unless waived. *Windholz v. Willis*, 1 Kan. App. 2d 683, 686, 573 P.2d 1100 (1977). See *City of Osawatomie v. Slayman*, 182 Kan. 770, 323 P.2d 910 (1958). The right to a jury trial, then, turns on the type of remedy sought. It would be illogical for this court to find that a jury, empaneled because monetary damages are sought, could not then fully determine the amount of damages suffered.

However, the legislature can modify the right to a jury trial through its power to change the common law. *Manzanares v. Bell*, 214 Kan. 589, 598, 616, 522 P.2d 1291 (1974). This power, however, is not absolute. Under *Manzanares*, any statutory modification of the common law must meet due process re-

quirements and be "reasonably necessary in the public interest to promote the general welfare of the people of the state." 214 Kan. at 599. Due process requires that the legislative means selected have a real and substantial relation to the objective sought. *Ernest v. Faler,* 237 Kan. 125, 129, 697 P.2d 870 (1985). One way to meet due process requirements is through substitute remedies. "We have never held one to have a vested right in the common-law rules governing negligence actions so as to preclude substituting a viable statutory remedy." *Manzanares v. Bell,* 214 Kan. at 599.

This concept of an adequate substitute remedy is known as *quid pro quo* (this for that). It finds its basis in a long line of Kansas due process cases. For example, the court in *Shade v. Cement Co.,* 93 Kan. 257, 144 Pac. 249 (1914) upheld the validity of worker's compensation legislation because coverage under the act was elective. The court ruled that the statutes did not deprive a worker of his right to a jury trial because the worker could chose to seek a remedy in the common law rather than under the statute, provided he made his election prior to injury. More recently, this court noted that, while the worker's compensation laws are no longer elective, they do remove certain common-law remedies for injured employees but provide a statutory substitute therefor. *Rajala v. Doresky,* 233 Kan. 440, 441, 661 P.2d 1251 (1983). The *Rajala* court upheld the legislation because the legislature provided, as a substitute, a viable statutory remedy.

In *Manzanares,* the court upheld the Kansas Automobile Injury Reparations Act (K.S.A. 40-3101 *et seq.*), noting that it provided a prompt recovery for loss without the requirement of proving liability in return for limits on the right to recovery. 214 Kan. at 599. Under K.S.A. 40-3117, any person who was entitled to no-fault benefits and whose medical expenses were less than $500 or who suffered no permanent disfigurement, fracture, or permanent injury, could not recover in a tort action for any nonpecuniary loss such as pain and suffering. 214 Kan. at 597. The court found, in substance, that the injured person entitled to benefits under the statute received a sufficient *quid pro quo* for the limitation placed on his right to a jury trial. The provision obviously did not affect the rights of a seriously injured plaintiff.

The legislation involved here seriously limits a plaintiff's right to recover nonpecuniary losses and then goes even further. It cuts off total recovery, and then requires the plaintiff to accept his award for future economic loss in the form of an annuity. In return for this infringement of his rights, the injured patient does not receive prompt payment (as in no-fault insurance) or a reduced burden of proof (as in workers' compensation). Rather, according to defendant, the plaintiff will receive regular payments, unattachable by creditors. He also will receive the benefits of lower-cost health care because doctors will save money on their insurance and obviously pass the savings on to their customers. Because of these savings, more doctors will also be able to continue their practices, thus assuring the plaintiff of *available* health care. Perhaps most importantly, defendant argues that the medical malpractice plaintiff will be *guaranteed* a recovery because of the doctor's insurance coverage. Defendant points out that many tort victims receive no compensation for their injuries because the tortfeasor has no assets.

However, as the trial court noted, this argument begs the question. Since 1976, health care providers in Kansas have been required to carry liability insurance in order to practice. L. 1976, ch. 231, § 2; K.S.A. 40-3402. Medical malpractice plaintiffs thus already had a source of recovery for their injuries—H.B. 2661 adds nothing to it. Nor do the savings that H.B. 2661 promises outweigh the plaintiff's lost rights. Actuaries testified that H.B. 2661 would result in a 5% decrease in the Fund surcharge. Should a doctor decide to pass these savings on to his hundreds of patients, each person's savings would be minuscule. In return, the terribly injured patient is denied all remedy for those injuries and losses which exceed the caps. This "substitute remedy" is truly inadequate and denies a seriously injured patient his right to trial by jury.

H.B. 2661 is, in effect, a statutory compulsory, preestablished remittitur. Its cap provisions force a successful plaintiff to forego part of his jury award without his consent, in clear contradiction of the general rule that damages for personal injury are to be reduced by remittitur only when they shock the conscience of the court and *only by providing the injured plaintiff the option of accepting the remittitur or asking for a new trial.* See *Slocum*

*v. Kansas Power & Light Co.,* 190 Kan. 747, 378 P.2d 51 (1963); *U.P. Rly. Co. v. Mitchell,* 56 Kan. 324, 43 Pac. 244 (1896); *Mo. Pac. Rly. Co. v. Dwyer,* 36 Kan. 58, 74-75, 12 Pac. 352 (1886).

Other Kansas cases have clearly stated that damages are an issue for the jury alone, and are not to be arbitrarily limited by the court. In *Domann v. Pence,* 183 Kan. 135, 141, 325 P.2d 321 (1958), we find the following language:

"As was said and held in *Knoche v. Meyer Sanitary Milk Co.,* 177 Kan. 423, 280 P.2d 605, there is of course no uniformity in our decisions on the proposition of when damages allowed in a personal injury action are excessive for the simple reason determination of the question necessarily depends upon the facts and circumstances of each particular case as it is presented for review. To like effect is *Smith v. Wichita Transportation Corp.,* 179 Kan. 8, 293 P.2d 242. No verdict is right which more than compensates—and none is right which fails to compensate. *(Union Pac. Ry. Co. v. Milliken,* 8 Kan. 647, 655.) Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence."

For these reasons, the caps and annuity provisions of H.B. 2661 violate the right to jury trial guaranteed by Section 5 of the Bill of Rights of the Kansas Constitution. Therefore, those sections are unconstitutional.

II. Whether the cap and annuity provisions of H.B. 2661 violate Section 18 of the Bill of Rights of the Kansas Constitution.

Section 18 of the Kansas Bill of Rights provides that all persons shall have a remedy by due course of law. The term remedy was defined in *Hanson v. Krehbiel,* 68 Kan. 670, Syl. ¶ 2, 75 Pac. 1041 (1904), as follows:

" 'Remedy .by due course of law,' as used in section 18 of the bill of rights, means the reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing."

Just as the rights secured by Section 5 are not absolute, neither are the rights secured by Section 18. Over the years, the court has allowed the legislature to modify remedies when required by public policy. See *Manzanares v. Bell,* 214 Kan. at 599. However, as with Section 5, the court looks to insure that due process

requirements are met and, when a common-law remedy is modified or abolished, an adequate substitute remedy must be provided to replace it.

*Hanson* involved a statute that limited the right of a person libeled to recover damages for injuries to his reputation. The statute required a prospective plaintiff to give three days' notice to the libeling newspaper prior to filing his suit. The newspaper could then run a full retraction and avoid liability for any damage to the plaintiff's reputation. The newspaper would remain liable only for any actual damages (expressed in dollars and cents). Plaintiff Hanson argued that the statute violated Section 18 and the court agreed. The court stated:

"It requires no argument to demonstrate that the act in question denies a remedy for some of these injuries. Unless the one libeled has suffered in the particular manner pointed out in the statute, he is without remedy. For that large class of persons and still larger class of injuries not falling within the provisions of this statute, no remedy is found. . . .

. . . .

"It is not an easy matter to deduce, either from reason or the authorities, a satisfactory definition of 'law of the land' or 'due course of law.' However, from either standpoint, we feel safe in saying that these terms do not mean any act that the legislature may have passed, if such act does not give to one an opportunity to be heard before being deprived of property, liberty, or reputation, or, having been deprived of either, does not afford a like opportunity to show the extent of his injury and gives no adequate remedy to recover therefor. Whatever more than this these terms may mean, they do mean due and orderly procedure of courts in the ascertainment of damages for injury, to the end that the injured one 'shall have remedy'; that is, proper and adequate remedy, thus to be ascertained. To refuse hearing and remedy for injury after its infliction is a principle little removed from that of the infliction of penalty before and without hearing." 68 Kan. at 673-74.

The remedy provided by the statute was inadequate, according to the court, because it treated every injury identically, irrespective of a court's findings.

"The right to a remedy by due course of law is not satisfied by the requirement contained in a statute to make specific reparation for the injury done, which reparation is the same in all cases, bears no relation to the injury suffered, and has not been decreed by a tribunal after ascertainment of the extent of such injury." 68 Kan. 670, Syl. ¶ 3.

Intervenors the Kansas Hospital Association and the Kansas Medical Society contend that *Hanson* was overruled by *Coleman*

*v. MacLennan,* 78 Kan. 711, 98 Pac. 281 (1908). There, the court held that a defendant newspaper's right to freedom of the press exceeded the political candidate's right to remedy for libel. 78 Kan. at 715-723. The real issue was the balancing of constitutional rights, freedom of speech for the media, and the political candidate's right to a remedy for libel. No legislation was involved, so there could be no issue of *quid pro quo.* At no place in the opinion does the court mention the subject of damages or refer to *Hanson. Coleman* has no applicability to the issues raised in this case.

The next important case is *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P.2d 934 (1954), where the court struck down the judicially created concept of charitable immunity. The court ruled that such immunity denied the right to a remedy by due course of law under Section 18. The court said:

"To exempt charitable and nonprofit corporations from liability for their torts is plainly contrary to our constitutional guaranties (Bill of Rights, § 18). It gives to certain favored ones, selected arbitrarily, immunity from that equal liability for civil wrongs which is a sign of equality between citizens. It undertakes to clothe charitable and nonprofit organizations with special privileges denied to other corporations, and society. It takes from individuals the right to assert in the courts claims against all who tortiously assail their person and property and to recover judgment for the injuries done. It prevents all persons from having recourse to law for vindication of rights or reparation for wrongs against the privileged charitable, nonprofit organization. It frees one set of corporations from obligations to which their competitors, and individuals, are subjected. In short, it destroys equality and creates special privilege. (*In re Opinion of The Justices,* 211 Mass. 618, 98 N.E. 337.)" 175 Kan. at 763.

The court reasoned that a denial of recovery from a charitable tortfeasor forces the victim to make an unreasonable contribution to charity against his will, "and a rule of law imposing such burdens cannot be regarded as socially desirable nor consistent with sound policy." 175 Kan. at 762. The concept of charitable immunity was thus held to deny plaintiff his right to a remedy and did not provide any adequate substitute remedy.

After *Noel* was handed down, the Kansas Legislature passed legislation designed to curtail the liability of charitable institutions by immunizing their assets from garnishment. *Neely v. St. Francis Hospital & School of Nursing,* 192 Kan. 716, 391 P.2d 155 (1964), involved a medical malpractice action where the

plaintiff had recovered part of her damages (up to the limits of the hospital's insurance coverage), but was denied full recovery because the statute involved (G.S. 1949, 17-1725 [1959 Supp.]) prevented her from obtaining a garnishment on the hospital's bank account. The court, relying heavily on *Noel*, refused to allow the legislature to do indirectly what could not be done directly. The court stated that the provisions in Section 18 of the Bill of Rights of the Kansas Constitution guaranteeing to persons a *remedy* by due course of law cannot be watered down by diluting the definition of *remedy*. The court used language which is equally apropos to the facts in the present case:

"The appellees contend a distinction must be made between 'remedy' and 'recovery.' They argue the statute in question in no way denies the appellant a remedy by due course of law. To support this contention they call our attention to the fact that the appellant has already been paid in excess of $58,000 on the judgment, and by reason thereof it is apparent she had a remedy. This argument overlooks the fact that if the appellee hospital had carried no insurance, the appellant would not have recovered one dime, assuming the validity of 17-1725, *supra*, is upheld. Furthermore, there would be no necessity for such hospitals to carry insurance in the future.

"The appellees further argue there is no section of the Constitution of this state or of the United States that guarantees full recovery to the prevailing party; that to provide a remedy is not to guarantee a right, or indemnify against wrong. Obviously, the extent of the assets of a judgment debtor are not guaranteed by any Constitution. This argument evades the issue." 192 Kan. at 721.

The court, in the words of Justice Schroeder, emphatically stated that Section 18 provides the right to a remedy for *all* injuries, not just a few.

"We adhere to the construction of Section 18 of the Bill of Rights of the Kansas Constitution placed upon it in *Noel v. Menninger Foundation, supra,* where it was said: '. . . It is the primary duty of the courts to safeguard the declaration of right *and remedy* guaranteed by the constitutional provision *insuring a remedy for all injuries. . . .*' (p. 763.) (Emphasis added.)" 192 Kan. at 722-23.

This court later upheld legislation under the *quid pro quo* analysis in *Manzanares v. Bell,* 214 Kan. 589, discussed earlier in this opinion. While recognizing that the no-fault insurance act limits the right to recover for losses due to pain, suffering, or mental anguish, the court upheld it because the act "assures all motor vehicle accident victims of prompt, efficient payment of certain economic losses. To the extent there is a limitation on a person's ability to recover nonpecuniary damages, the rights received in exchange are no less adequate." 214 Kan. at 599.

The most recent case reviewing Section 18 is *Ernest v. Faler*, 237 Kan. 125. There, the court struck down a "notice of claim" statute which effectively cut off the right to recover damages for negligent pesticide application. The court reviewed *Hanson, Noel,* and *Neely,* and restated that "the right of a person injured by the tortious act of another to a remedy for his injuries is one of the basic constitutional rights guaranteed protection by the Kansas courts." 237 Kan. at 132. The court held the statute unconstitutional as a violation of due process because it was unfair, unreasonable, and did not have a real or substantial relation to the objective sought. 237 Kan. at 138.

Both plaintiffs and defendant agree that these cases result in one rule: The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished. Intervenors Kansas Medical Society and Kansas Hospital Association stand alone in urging a different rule upon this court. They argue that *Wright v. Pizel*, 168 Kan. 493, 214 P.2d 328 (1950), overrules *Hanson,* supports *Coleman,* and stands for the rule that removal of a remedy can be justified any time by public need. However, the *Wright* court specifically noted that it did not reach the issues of whether the plaintiff had a common-law right to sue for injuries received while he was a guest in an automobile and whether the legislature had substituted some other remedy in return for denying that right. 168 Kan. at 505-06. *Wright* thus involved an entirely different analysis than we are concerned with here. It is also important to note that *Hanson* is cited and relied on in *Ernest v. Faler*, 237 Kan. at 131-32, as a basis for the decision.

Having considered established Kansas law, we now turn to the case at hand. There can be little doubt that H.B. 2661 infringes on the right to a remedy by limiting recovery for noneconomic loss, overall loss, and by forcing successful plaintiffs to accept their award over a number of years by means of an annuity contract. *Neely* is clearly controlling on this point. In *Neely,* the practical effect of the statute was to limit a patient's recovery to the extent of the hospital's insurance coverage, an arbitrary limit. Here, H.B. 2661 by its caps cuts off recovery at $250,000 and $1,000,000, also arbitrary amounts. In *Neely,* the court found that

the right to a remedy means the right to a *full* remedy, regardless of the likelihood of recovery. *Neely v. St. Francis Hospital & School of Nursing,* 192 Kan. at 722-23. This same flaw must also cut down the $3,000,000 "pinhole" provision, for it is simply another limit on recovery, albeit higher.

The forced remedy of recovery of future damages by annuity also violates the common-law right to a remedy. The annuity provided for in the statute is a contract, owned and controlled by someone else. Plaintiffs traditionally receive lump-sum judgments that they control. While a plaintiff may certainly agree to accept his judgment in the form of an annuity (or in whatever form he chooses), the concept of forcing him to accept an annuity limits his remedy. His payout may take years and, as Judge Theis noted, there is always the risk of default, however slight. Lump-sum payments do not carry such risks. Annuities, therefore, modify the common law with regard to remedies.

Assuming, then, that H.B. 2661 limits a plaintiff's right to a remedy under Section 18, we must then decide if the plaintiff has received a *quid pro quo,* or an adequate substitute remedy. Again, defendant and intervenors argue that the plaintiff receives a guaranteed recovery because doctors will have available, affordable insurance coverage. In a somewhat circular argument, they contend that H.B. 2661 lowers the cost of insurance, thereby encouraging doctors to continue their practices, increasing the number of doctors available, and guaranteeing the availability of quality health care to seriously injured malpractice victims. This is not a sound argument. If it were not for negligent health care providers, their victims would not need the continuing health care. The argument also ignores the fact that health care providers have been required to carry malpractice insurance since 1976. Thus a plaintiff's source of recovery is already provided by K.S.A. 40-3402 and K.S.A. 1987 Supp. 40-3404.

The language in *Neely* points out that access to a source of recovery is vastly different from the right to a remedy. "[T]o provide a remedy is not to guarantee a right, or indemnify against wrong. Obviously, the extent of the assets of a judgment debtor are not guaranteed by any Constitution. This argument evades the issue." 192 Kan. at 721. The answer is the same today: no medical malpractice victim is guaranteed the right to recover for

all of his injuries. Thus, it is legally valid for the legislature to abolish the Fund or cap liability of *the Fund* at $1,000,000 or any other amount. However, the legislature cannot abolish the right to a remedy by capping a plaintiff's *recovery* at $250,000, $1,000,000, or even $3,000,000 without providing an adequate substitute remedy. The "substitute" they propose here is nothing new in the law. H.B. 2661 removes a substantial right of the plaintiff and gives him *nothing* in return.

H.B. 2661, without question, eradicates the right to a remedy by due course of law for certain injuries. Just as in *Noel,* it eliminates the right to a remedy for those injured by a certain favored group of tortfeasors. Just as in *Neely,* it restricts the right to a remedy by redefining "recovery." The effect of H.B. 2661 is to force every plaintiff to make a contribution, against his will, to the medical malpractice insurance industry. Yet it provides no adequate substitute remedy, and thus falls short of the requirements of *Manzanares.*

The cap and annuity provisions of H.B. 2661 infringe upon a medical malpractice victim's constitutional right to a remedy by due course of law and no *quid pro quo* is provided in return. The trial court was correct in holding the caps and the annuity provisions unconstitutional as a violation of Section 18.

III. Whether the cap and annuity provisions violate equal protection of the law under Section 1 of the Kansas Bill of Rights.

In view of the findings of this court that the cap and annuity provisions violate Sections 5 and 18 of the Kansas Bill of Rights, a consideration of the equal protection argument under Section 1 has become moot. We agree with the trial court that it makes no real sense to apply an equal protection argument analysis to the cap and annuity provisions when the result in the case is controlled by Sections 5 and 18 of the Kansas Bill of Rights.

Under the circumstances, we do not determine the equal protection issue in this case.

IV. Whether the trial court erred in severing various provisions of H.B. 2661 and in refusing to sever other provisions.

The trial court held unconstitutional the cap provisions of Section 13 (K.S.A. 1987 Supp. 60-3407), the annuity provisions of Section 15 (K.S.A. 1987 Supp. 60-3409), and the so-called "pinhole" provisions of Section 28 (K.S.A. 1987 Supp. 60-3411). We

affirm the trial court's judgment that those sections violate Sections 5 and 18 of the Kansas Bill of Rights and are therefore unconstitutional and unenforceable.

The trial court then held that all other sections of H.B. 2661 were severable and not affected by the unconstitutionality of Sections 13, 15, and 28, except for Sections 27(h) (K.S.A. 1987 Supp. 40-3403[h]), which immunized health care providers from vicarious liability, and Section 27(f) (40-3403[f]), which limited the liability of the Fund to $1,000,000 per claim and $3,000,000 yearly aggregate per health care provider.

The limits on liability claims existing on July 1, 1986, and prior thereto were $3,000,000 for an individual judgment or settlement and an aggregate limitation of $6,000,000.

We have considered the arguments of counsel and have concluded that the trial court erred in holding that the vicarious liability provision of Section 27(h) (40-3403[h]) is not severable from the sections found to be unconstitutional in this case. Neither the plaintiffs, the defendant, nor the intervenors addressed the validity of Section 27(h) in the trial court, nor is it clear that plaintiffs would have standing to do so. The trial court, without constitutional analysis, concluded that the vicarious liability provision was so closely tied to the cap and annuity provisions that it fell with those provisions. While the provision for abolition of vicarious liability may or may not be unconstitutional, that issue was not properly raised in this case. The trial court erred in striking down Section 27(h).

The question of whether Section 27(f) of H.B. 2661 (40-3403[f]) is voided because that section is not severable from the cap and annuity provisions presents a much more difficult issue. The problem is whether the invalidity of Sections 13, 15, and 28 of H.B. 2661 should restore the prior limitation on Fund liability in the amount of $3,000,000 per claim and an aggregate limitation of $6,000,000 as the statutes provided prior to the enactment of H.B. 2661. Would the legislature have reduced the limitations on the liability of the Fund in the absence of the cap and annuity provisions?

We have concluded that the legislature would not have done so. We are persuaded by the fact that the legislature enacted the "pinhole" provision of Section 28 (K.S.A. 1987 Supp. 60-3411),

which shows a legislative intent to retain the $3,000,000 limit for each claim in cases where the "pinhole" provision was applicable. Furthermore, we believe finding Section 27(f) void would be unfair to health care providers who failed to obtain insurance coverage above $1,000,000, in reliance on the cap and annuity provisions.

We hold that, until the legislature enacts legislation to lower the liability of the Fund from $3,000,000 on an individual judgment or settlement and from an aggregate liability of $6,000,000, those limitations shall continue. All other sections of H.B. 2661 shall remain in effect except that references in any section to Sections 13, 15, or 28 shall be of no force and shall be disregarded.

For the reasons set forth in this opinion, the judgment of the district court is affirmed, but modified to hold that Section 27(h) of H.B. 2661 (K.S.A. 1987 Supp. 40-3403[h]) is severable and remains in full force and effect.

HOLMES, J., dissenting.

McFARLAND, J., dissenting: Having authored a considerable number of dissents in the ten plus years I have been on this court, I was, at first, at a loss to understand my reluctance to write a dissent in this case. For some inexplicable reason, I felt like a noncombatant in ancient Rome about to attempt a crossing of the arena in the Coliseum. Upon reflection came the realization that my feelings of anxiety arose from the unique nature of the controversy churning and boiling around the subject matter of this litigation. There are a few areas of legislation and court decisions which evoke primal emotions in the general public. At the present time the subject of abortion would probably head this list. But regulation of malpractice legislation is not in this category. The general public is not aroused. There are no long processions of irate citizens carrying placards and chanting slogans marching around courthouses and state capitols on this issue. The intense feelings, the anger, and the rage are there but they are in the minds of professionals who believe their livelihoods are at risk. Many physicians truly believe that the legal profession is out to destroy them for personal gain. Many lawyers believe, with equal sincerity, that the medical profession is

attempting, through legislation, to avoid its responsibility for harm done by its members. Companies providing medical malpractice insurance are attacked by both groups. Unfortunately, the militant approach spills over into the majority opinion. Accurate information and statistical data upon which to evaluate the true situation are nonexistent. Vocal extremists on both sides make wild accusations based upon unverifiable statements of facts. It is not surprising that the public hearings held by the legislature resulted in a flood of conflicting opinions and misinformation. The legislature has been placed in a very difficult position. The proponents and opponents of the proposed legislation are presumably speaking from knowledge and expertise—not just emotional beliefs.

Looking at the situation from an objective perspective, one would, I believe, have to conclude that there was ample evidence to support the legislative conclusion in 1976 that significant problems existed which could affect the availability of adequate health care for Kansas citizens and the payment of claims arising from the providing of health care. In 1976 the legislature enacted the Kansas Health Care Provider Insurance Availability Act (K.S.A. 1976 Supp. 40-3401 *et seq.*), which this court held constitutionally valid in *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 576 P.2d 221 (1978). In *Schneider* we stated:

"The Kansas Health Care Provider Insurance Availability Act was passed by the 1976 legislature as a partial response to increasing pressure brought upon Kansas health care providers because of the national medical malpractice crisis. The primary feature of the act is the requirement that all health care providers operating within the state must obtain professional malpractice liability insurance (40-3402) and pay a surcharge to the health care stabilization fund (40-3404). The law requires the provider to carry a basic policy of $100,000 per occurrence and an annual aggregate of $300,000 for all claims made during the period. The stabilization fund provides for the payment of claims in excess of policy limits. Included in the act is a provision requiring every health care insurer to participate in an apportionment plan whereby any health care provider may obtain liability insurance from the plan if insurance from a conventional source (40-3413) is not available.

"The problem of obtaining and maintaining affordable malpractice insurance came before the legislature in 1971, 1973 and 1975. As a result, the legislature enacted a law in 1975 requiring all health care insurers to report their claims experience to the commissioner of insurance (K.S.A. 1975 Supp. 40-1126, *et seq.*).

In 1976, however, the problem had grown to such proportions it received full legislative attention. A legislative interim committee was told in detail how insurance costs had skyrocketed on present policies, policies were unavailable for new doctors, insurers were beginning to withdraw from the medical malpractice field, and the availability of medical service in some Kansas communities was threatened. In response, the committee proposed twelve bills, including the act in the present controversy.

"The original bill did not require mandatory insurance coverage, nor did it require payment of the surcharge. These provisions were added by the legislature at the behest of Insurance Commissioner Fletcher Bell. The mandatory coverage provision, it was alleged, would provide for the financial stability of the insurance availability program and would assure all Kansans they would have a source of recovery for damages resulting from malpractice." 223 Kan. at 611.

Obviously, the 1976 legislature hoped this legislation would resolve the problems. By 1984 the Health Care Stabilization Fund was in serious financial trouble and the 1984 legislature enacted a $3,000,000 cap on the Fund's liability (L. 1984, ch. 178, § 1). By 1986 the Fund was insolvent. It really does not matter at this point to pinpoint with exactitude why the Fund was insolvent. Inadequacy of the surcharge imposed against physicians in prior years and sharply rising jury verdicts were but two of the reasons. Since the 1984 cap of $3,000,000 on the Fund's liability, physicians desiring coverage in excess of $3,000,000 were being faced with rapidly escalating premiums, particularly those practicing in the high risk areas of medicine (surgery, anesthesiology, obstetrics, etc.). One area of concern presented to the legislature was that many physicians were giving up the practice of obstetrics in the face of the high insurance premiums associated therewith. This was a problem in the rural areas particularly when delivering babies was just one phase of the general practitioner's work. The delivery of a brain-damaged baby exposes the attending physician to a potentially financially devastating liability. Anything he did or did not do is opened up as a possible cause of the infant's defect. Even though 95 percent of the medical profession in the field might agree the physician breached no duty of care, a jury may believe a representative of the five percent who says he breached a duty and caused the defect. Based upon the long life-expectancy of an injured baby, the verdict could be far in excess of the $3,000,000 cap of the Fund.

Any ten professionals, whether they be physicians, lawyers, or

insurance company experts, would have ten different proposals to attempt to resolve the problems existing. The legislature held its hearings, discussed the problems from all angles, and decided on the course of action reflected in H.B. 2661 (L. 1986, ch. 229). The wisdom or desirability of that legislative decision is not a subject of judicial review. The legislature is the branch of government granted the power to make such determinations free of any interference by the judicial branch except where such enactment is violative of the Kansas or United States Constitutions.

The majority has found three sections of H.B. 2661 to be unconstitutional. They are those sections codified as K.S.A. 1987 Supp. 60-3407, 60-3409, and 60-3411 which set caps on the amount of the recovery and require an annuity for payment of future economic loss. These sections were found to be violative of Sections 5 and 18 of the Bill of Rights of the Kansas Constitution. I do not agree.

The majority opinion correctly states the standards of judicial review as follows:

"The constitutionality of a statute is presumed, and all doubts must be resolved in favor of its validity. Before a statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done."

Before us is the constitutionality of certain 1986 legislative enactments. These enactments cannot be viewed in a vacuum separate and apart from the Health Care Provider Insurance Availability Act (K.S.A. 40-3401 *et seq.*).

The original Act was enacted in 1976. Modification of the Act to improve or resolve problems therewith has been an ongoing process. Illustrative therewith is the fact that K.S.A. 40-3401, alone, has been amended in 1977, 1979, 1980, 1982, 1984, 1985, 1986, and 1987. The original Act required the defined "health care providers" to carry $100,000 per occurrence and $300,000 annual aggregate insurance. In 1984 the amounts were raised to $200,000 and $600,000, respectively. The Health Care Stabilization Fund initially provided unlimited excess liability, but was subsequently reduced to $3,000,000 per claim and an aggregate of $6,000,000.

The particular provisions at issue are codified in Article 34 of Chapter 60, commonly designated as the Professional Liability Actions Act. The purpose of the Act is set forth in K.S.A. 1987 Supp. 60-3405 as follows:

"Substantial increases in costs of professional liability insurance for health care providers have created a crisis of availability and affordability. This situation poses a serious threat to the continued availability and quality of health care in Kansas. In the interest of the public health and welfare, new measures are required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas."

This Act must be viewed in conjunction with the Health Care Provider Insurance Availability Act, as they are both involved with legislation aimed at resolving the same problem and for similar purposes. The 1986 legislation caps the total recovery at $1,000,000 with the pinhole provision. Obviously, these amendments reducing the Fund's liability and placing a cap on the maximum recovery are less favorable to the severely damaged individual than the original Act, but this fact does not authorize the scrutiny of the 1986 legislation as being separate and apart from the original Act. The passage of the Health Care Provider Insurance Availability Act was landmark legislation. It provided protection for Kansas citizens and others utilizing the services of Kansas health care providers in previously unheard-of dimensions. A person injured through malpractice by these providers was assured the provider was insured and covered under the State-backed fund. The list of professions within the term "health care provider" has been expanded over the years to include those set forth in K.S.A. 1987 Supp. 40-3401 as follows:

"(f) 'Health care provider' means a person licensed to practice any branch of the healing arts by the state board of healing arts, a person who holds a temporary permit to practice any branch of the healing arts issued by the state board of healing arts, a person engaged in a postgraduate training program approved by the state board of healing arts, a medical care facility licensed by the department of health and environment, a health maintenance organization issued a certificate of authority by the commissioner of insurance, an optometrist licensed by the board of examiners in optometry, a podiatrist registered by the state board of healing arts, a pharmacist licensed by the state board of pharmacy, a licensed professional nurse who is authorized to practice as a registered nurse anesthetist, a licensed professional nurse who has been granted a temporary authorization to

practice nurse anesthesia under K.S.A. 1987 Supp. 65-1153 and amendments thereto, a professional corporation organized pursuant to the professional corporation law of Kansas by persons who are authorized by such law to form such a corporation and who are health care providers as defined by this subsection, a partnership of persons who are health care providers under this subsection, a Kansas not-for-profit corporation organized for the purpose of rendering professional services by persons who are health care providers as defined by this subsection, a dentist certified by the state board of healing arts to administer anesthetics under K.S.A. 65-2899 and amendments thereto, a physical therapist registered by the state board of healing arts, a psychiatric hospital licensed under K.S.A. 75-3307b and amendments thereto, or a mental health center or mental health clinic licensed by the secretary of social and rehabilitation services, except that health care provider does not include (1) any state institution for the mentally retarded, (2) any state psychiatric hospital or (3) any person holding an exempt license issued by the state board of healing arts."

There are no statutes providing any such level of protection to those employing the services of any other group of professionals. As admitted by the majority opinion, the 1986 cap and annuity provisions would affect only a relative handful of claims. The purpose of the original Act and the 1986 legislation encompassed more than just payment of claims. The legislation intended to insure the availability of all types of medical services to every area of the state—including the high-risk practice services. It is intended to hold down the cost of health insurance and health services. It may be argued that the legislation will not accomplish its goals, but that is not the question herein. As we stated in *Manzanares v. Bell*, 214 Kan. 589, Syl. ¶ 13, 522 P.2d 1291 (1974):

"It is not within the province of the supreme court to weigh the desirability of social or economic policy underlying a statute, nor weigh the beneficial results flowing from any particular legislative policy."

The majority has found the complained-of 1986 legislation violative of the due process guaranteed by Section 18 of the Bill of Rights of the Kansas Constitution, which provides:

"§ 18. Justice without delay. All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

In *State ex rel. Schneider v. Liggett*, 223 Kan. 610, a challenge to mandatory insurance requirements of the original act, we discussed the due process requirement as follows:

"We turn to the due process and equal protection arguments raised by

defendant. In order to properly resolve these issues it is necessary to understand the distinction between these two constitutional concepts. In *Ross v. Moffitt,* 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437, the court explained:

" '. . . "Due process" emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. "Equal protection," on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. . . .' (p. 609.)

"The standard of review in a due process case has fluctuated in response to society's changing attitudes concerning the proper role of the judiciary in the examination of social and economic regulations imposed pursuant to the state's police power. In the past courts often struck down laws with which they disagreed on the basis that due process was violated. (See, *e.g., Tyson & Brother v. Banton,* 273 U.S. 418, 71 L. Ed. 718, 47 S. Ct. 426 [1927]; *Adkins v. Children's Hospital,* 261 U.S. 525, 67 L. Ed. 785, 43 S. Ct. 394 [1923]; *Coppage v. Kansas,* 236 U.S. 1, 59 L. Ed. 441, 35 S. Ct. 240 [1915]; *Adair v. United States,* 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 [1908]; *Lochner v. New York,* 198 U.S. 45, 49 L. Ed. 937, 25 S. Ct. 539 [1905].) This practice fell into disrepute, however, beginning with the case of *Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505. There the court retreated from its previous attitude and declared the test for due process to be whether the legislative means selected had a real and substantial relation to the objective sought. The rule has been restated in terms of whether the regulation is reasonable in relation to its subject and is adopted in the interest of the community. (*West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A.L.R. 1330.) Courts can no longer sit as a 'super legislature' and throw out laws they feel may be unwise, improvident or inappropriate. (*Ferguson v. Skrupa,* 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A.L.R.2d 1347; *Williamson v. Lee Optical Co.,* 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461.) That view remains valid today. (See, *North Dakota Pharmacy Bd. v. Snyder's Stores,* 414 U.S. 156, 38 L. Ed. 2d 379, 94 S. Ct. 407; *Dean v. Gadsden Times Publishing Corp.,* 412 U.S. 543, 37 L. Ed. 2d 137, 93 S. Ct. 2264; *Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678.)" 223 Kan. at 613-14.

I believe the complained-of 1986 legislation has a real and substantial relation to the objective sought. Under the standards set forth in *Schneider,* there is no violation of due process.

The majority opinion also holds the complained-of 1986 legislation is violative of Section 5 of the Bill of Rights of the Kansas Constitution which provides:

"§ 5. **Trial by jury.** The right of trial by jury shall be inviolate."

In *Manzanares v. Bell,* 214 Kan. 589, the constitutionality of the Automobile Injury Reparations Act (K.S.A. 40-3101 *et seq.*) was before this court. One aspect of the legislation set thresholds

a party injured in a motor vehicle accident must reach before being permitted to file an action against the negligent party or parties as set forth in K.S.A. 40-3117, as follows:

"In any action for tort brought against the owner, operator or occupant of a motor vehicle or against any person legally responsible for the acts or omissions of such owner, operator or occupant, a plaintiff may recover damages in tort for pain, suffering, mental anguish, inconvenience and other non-pecuniary loss because of injury only in the event the injury requires medical treatment of a kind described in this act as medical benefits, having a reasonable value of five hundred dollars ($500) or more, or the injury consists in whole or in part of permanent disfigurement, a fracture to a weight-bearing bone, a compound, comminuted, displaced or compressed fracture, loss of a body member, permanent injury within reasonable medical probability, permanent loss of a bodily function or death. Any person who is entitled to receive free medical and surgical benefits shall be deemed in compliance with the requirements of this section upon a showing that the medical treatment received has an equivalent value of at least five hundred dollars ($500). Any person receiving ordinary and necessary services, normally performed by a nurse, from a relative or a member of his household shall be entitled to include the reasonable value of such services in meeting the requirements of this section. For the purpose of this section, the charges actually made for medical treatment expenses shall not be conclusive as to their reasonable value. Evidence that the reasonable value thereof was an amount different than the amount actually charged shall be admissible in all actions to which this subsection applies."

This act completely cut off all recovery for nonpecuniary losses such as pain and suffering, inconvenience, etc., for injured persons not reaching one of the thresholds. (Note: The Act was amended in 1987 to increase the monetary threshold to $2,000.) In finding the Act constitutionally valid, this court stated:

"The no-fault Act is a legislative directive to insure prompt and equitable compensation to persons injured by motor vehicles. This is accomplished by Sections 4 and 7 which provide direct benefits to the insured automobile owner, his family, guest passengers, others operating his car with permission, and to pedestrians struck by his motor vehicle, regardless of fault in the causation of the accident. As we have stated previously, the purpose of requiring prompt payment of compensation to persons injured in a motor vehicle is within the scope of the police power of the state. (*Pinnick v. Cleary*, [360 Mass. 1, 271 N.E. 2d 592 (1971)]; *City of Wichita v. White*, [205 Kan. 408, 469 P.2d 287 (1970)]; *Opinion of the Justices*, [113 N.H. 205, 304 A.2d 881 (1973)].) One of the obvious purposes of the Legislature in limiting recovery under the threshold provision was clearly to eliminate minor claims for pain and suffering. The Legislature could reasonably have thought that the number of such cases (see DOT study) was largely connected with exaggerated claims for pain and suffering in instances of relatively minor injury. Our prior decisions are to the effect that subjective com-

plaints of pain and suffering defy accurate monetary appraisal. (*Domann v. Pence*, 183 Kan. 135, 325 P.2d 321 [1958]; *Henderson v. Kansas Power & Light Co.*, 188 Kan. 283, 362 P.2d 60 [1961].) In addition, minor 'nuisance' claims were often overpaid, and as stated in *Pinnick v. Cleary*, supra, '. . . It was clearly proper for the Legislature to conclude that the benefits of compensating an injured person for relatively minor pain and suffering, which as such entails no monetary loss did not warrant continuation of the practice when balanced against the evils it had spawned.' (p. 610.)

"We conclude the threshold limitation is a determination by the Legislature of public policy, and is reasonably related to problems that affect the public welfare, including the economic welfare of the state and its citizens, and therefore bears a rational relationship to the legislative objective of compensating persons promptly for accidental bodily injury arising out of the ownership and use of motor vehicles.

"Plaintiff next contends the monetary medical expense standard, set at $500 by Section 17, arbitrarily and invidiously discriminates between various segments of the state's population; that the $500 standard is not reasonably related to any legitimate legislative purpose; and that such a standard discriminates against those persons who are economically disadvantaged. The contentions are without merit." *Manzanares v. Bell*, 214 Kan. at 610-11.

*Manzanares v. Bell*, further stated in Syl. ¶ 2:

"While the Legislature is restricted in the extent to which it can retroactively affect common-law rights, no person has a vested right in common-law rules governing a negligence action arising out of a motor vehicle accident so as to entitle him to insist the common law remain static for his benefit."

The change from the concept of contributory negligence to comparative fault adversely affected some individuals. A negligence free plaintiff suing an extremely negligent pauper and a less negligent wealthy corporation would be severely affected in his recovery by the change, as under the prior law he could collect the entire judgment from the corporation. Yet no one asserts an individual has a common-law right to have liability determined under the concept of contributory negligence.

47 Am. Jur. 2d, Jury § 18 states that the object of the constitutional provisions guaranteeing the right of trial by jury is to preserve the *substance* of the right rather than to prescribe the details of the methods by which it is to be exercised and enjoyed, and these provisions are not so inelastic as to render unchangeable every characteristic and detail of the common-law system. This point was made by the Indiana Supreme Court in *Hayworth v. Bromwell*, 239 Ind. 430, 158 N.E.2d 285 (1959), when it said:

"The provision of the Constitution of Indiana that the right to a trial by jury in all civil cases shall remain inviolate means that the substantial elements and incidents, which pertained to a trial by jury at common law, shall not be altered or changed by the Legislature or the courts and are preserved in substance as they existed at common law." 239 Ind. at 437.

And:

"[I]t is the substance of the right which 'shall remain inviolate,' not the manner in which it is exercised or waived." 239 Ind. at 435.

Both *State ex rel. Schneider v. Liggett*, 223 Kan. 610, and *Manzanares v. Bell*, 214 Kan. 589, take the generally accepted broad look at the legislation in question. The collective common good sought to be obtained by the legislation is the area of scrutiny rather than how the legislation might adversely affect certain individuals. Certainly a far greater number of individuals have been and will be affected by the threshold limitations for recovery of nonpecuniary losses in automobile accident cases than will ever be affected by the legislation before us. The majority finds restriction on the recovery of a small number of individuals severely injured by medical malpractice constitutionally impermissible although outright elimination of major elements of smaller claims arising from automobile accidents has been held to be constitutionally acceptable by this court.

Workers' compensation statutes which barred all actions at law against an employer by an injured employee have repeatedly been held constitutionally acceptable under concepts of the collective good accomplished by the legislation.

Statutes of limitations, entries of summary judgment or directed verdict, limitations on garnishments, and bankruptcy laws are all examples of legislation which would violate Section 5 if read literally under the interpretation of the majority herein. I do not believe Section 5 creates a vested right to any particular remedy in medical malpractice actions.

The great value of the mandatory insurance provisions in the original act and the Fund's excess liability cannot be ignored. We live in a time when many physicians are foreign born and foreign trained. Without the Act, a person injured by one of these individuals would have no means of recovery at all should the physician simply return to his country of origin or move to some other country. An entire judgment against an uninsured physi-

cian remaining in the country could be defeated by the bank-ruptcy laws. The legislature since 1974 has been struggling with a problem facing many states. Many amendments have been enacted and many more will, no doubt, in the future be enacted. Recovery afforded to the most severely injured is just one aspect of the entire problem. Assured recovery afforded to the less severely injured, availability of medical care, cost of health insurance, and holding down medical fees are other aspects of the problem.

I also do not find the annuity aspect of the legislation consti-tutionally deficient. It applies only to future economic loss and requires the annuity to be paid out over the period of time specified in the verdict. The availability of money to pay is assured and will be paid as the loss occurs—much like disability or health insurance. It provides a form of protection to the most severely injured—that money will be paid when the jury has determined that aspect of the loss will occur. The bulk of this item will generally be future lost wages and future medical expenses. In disability or health insurance, such payments are generally not lump sum payments, but rather are paid as the future loss occurs.

In conclusion, some general observations are appropriate. The legislature is attempting to resolve some extremely difficult problems of basic concern to the public. There is no quick fix or easy solution, as Kansas and many other states have found. The present hostile attitude of the medical and legal professions makes resolution of the complex problem even more difficult. Any legislation represents a compromise among many different opinions and proposals. Hopefully, the future will see a realiza-tion that the welfare of the public is vitally concerned with finding the best solution to the problem, and the special interest groups will take a more reasonable and less vituperative ap-proach to resolution of the problem.